Lawrence **GOLDSTEIN**,
Plaintiff-Appellee,
Cross-Appellant,

v.

**MANHATTAN INDUSTRIES, INC.,** a
corporation, Defendant-Appellant,
Cross-Appellee.

No. 84–7233.

United States Court of Appeals,
Eleventh Circuit.

April 25, 1985.

Rehearing and Rehearing En Banc
Denied May 30, 1985.

---

C. Richard Langley, Albany, Ga., for defendant-appellant, cross-appellee.

John C. Falkenberry, Birmingham, Ala., for plaintiff-appellee, cross-appellant.

Before KRAVITCH and JOHNSON, Circuit Judges, and TUTTLE, Senior Circuit Judge.

TUTTLE, Senior Circuit Judge:

This is an action brought in the Northern District of Alabama by Lawrence Goldstein against his former employer, Manhattan Industries, Inc. ("Manhattan"), alleging

that his employment was terminated in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.* The employer appeals from a judgment rendered on a jury's verdict for the plaintiff, and the employee cross-appeals from the district court's selection of remedies.

## BACKGROUND

### A. *Goldstein's Discharge*

Goldstein took a job with Manhattan Industries as a sales representative for its ladies' shirts and blouses, sold under the "Lady Manhattan" label, in 1960, when he was 38 years old. From that time until his dismissal in 1982 at age 60, Goldstein was Manhattan's exclusive representative in Alabama, Georgia and the Florida panhandle. Much of Goldstein's income was derived from his major store accounts, particularly Rich's and Davison's in Atlanta.

In 1979, Manhattan decided to reorganize its marketing arrangement and decided that sales representatives would no longer sell to the major department stores in their territories. Instead, those stores were to become "house accounts" administered in the company's New York office. To compensate their sales representatives, such as Goldstein, for the resulting reductions in their income, the company agreed to allow them to represent non-competing apparel lines along with Manhattan's products. After the first year of this arrangement, Manhattan also agreed that Goldstein could display and sell these "outside lines" in Manhattan's permanent showroom in the Atlanta Apparel Mart, so long as he paid the rent and expenses on the showroom.

Subsequently, Goldstein regularly attended seasonal apparel shows in Atlanta and Birmingham. He advertised in trade papers that not only his Lady Manhattan products but also his other lines would be exhibited at his assigned location. Goldstein paid for the advertisements, paid the rent on the Atlanta showroom space at the Atlanta Apparel Mart and paid all charges for exhibition space at other shows. Using Lady Manhattan as his "headliner" and the company's desirable location in the Apparel Mart, Goldstein successfully attracted customers for all of his merchandise.

In 1980, Goldstein generated $1,020,165.83 in sales of Lady Manhattan products despite the loss of the Rich's and Davison's accounts. This was the third highest net sales figure among the company's sales representatives that year. In 1981, Goldstein's sales figure was $830,311.06, fourth highest for the company.[1] Goldstein's earnings from both Manhattan and his outside lines from 1974 to 1983 are set forth in the margin.[2]

Apparently the Lady Manhattan division was in a shaky financial condition from 1979 to 1981. The plan to handle major store accounts from the New York office proved ill-conceived. Moreover, Goldstein testified that the company produced a poor product line during those years. Sales were down nationally.

In early 1982, Bob Guberman, age 41, and Preston Imber, age 39, took over management of the Lady Manhattan division, Guberman as vice president and Imber as

---

1. No sales figures are available for years prior to 1980, since the company destroys such records after three years.

2.

| Year | Manhattan Industries | Outside Lines |
|------|---------------------|---------------|
| 1974 | $41,037.46 (including reimbursed expenses of $9,000) | -- |
| 1975 | $66,102,19 (including reimbursed expenses of $2,250) | -- |
| 1976 | $57,295.55 | -- |
| 1977 | $52,085.98 | -- |

| Year | Manhattan Industries | Outside Lines |
|------|---------------------|---------------|
| 1978 | $78,496.32 | -- |
| 1979 | $59,660.37 | $4,377.00 |
| 1980 | $44,590.02 | $32,837.00 |
| 1981 | $49,744.46 | $53,687.00 |
| 1982 | $15,834.27 | $34,126.00 |
| 1983 | -- | $38,712.22 |

national sales manager. They apparently determined to phase the exclusivity requirement back in and selected six sales territories, including Goldstein's, in which the sales representatives would be required to abandon their outside lines. According to Imber, 12 territories had been returned to exclusivity by the end of 1983 and all of the sales representatives in those territories had received back their major accounts. Eight territories situated in various parts of the United States remained non-exclusive.

On March 3, 1982, Guberman traveled to Florida to interview applicants for sales representative positions. On Thursday, March 4, he stopped in Atlanta to meet with representatives of Rich's and Davison's and to interview Michael Eiseman, age 46, as a possible replacement for Goldstein. He called Eiseman up at 11:00 p.m. and told him to come to an interview at 11:30 p.m. at the Hyatt Regency Hotel in Atlanta. Eiseman had previously applied for the position and had met with Guberman in New York in February.

At 8:00 the same evening, Guberman called Goldstein at his home in Birmingham, Alabama, to tell him that the company would no longer permit Goldstein to sell outside product lines and that it expected him to return to an exclusive basis. Guberman told him that sales representatives who returned to exclusivity would be assured a $25,000 yearly salary plus a $25,-000 draw, or advance, against future commissions.

Goldstein insists that Guberman said nothing about returning the Rich's and Davison's accounts to Goldstein and that Guberman in fact said they would remain house accounts. Guberman, however, contends that he did offer to return these accounts to Goldstein and that such an offer would have been consistent with the company's policy of returning the major accounts to the sales representatives.

Goldstein telephoned Guberman in New York on Monday, March 8, with a counterproposal, whereby Goldstein's nephew would take over primary responsibility for the outside lines. He suggested trying this out on a season-to-season basis. Goldstein claims that in that conversation he protested to Guberman that it was unfair for the company to ask him to give up his outside lines without receiving the Rich's and Davison's accounts in return.

Guberman rejected Goldstein's proposal by certified letter dated March 11, which was not received by Goldstein until March 15. The letter restated Guberman's position that Goldstein would have to give up his outside lines, but said nothing about the major store accounts.[3]

Two earlier drafts of this letter were introduced. In a handwritten draft, apparently prepared on March 8 or 9, Guberman referred to substandard sales figures in Goldstein's territory. He then continued,

---

3. Guberman's letter read as follows:

March 11, 1982

Dear Larry:

As a follow-up to our conversation in Atlanta last Thursday, 4th, I must now ask you to again advise me of your intentions. At that time you were told of Lady Manhattan's plans to re-organize its sales force. I offered to you, as I have to other multiple line representatives, the option of a $25,000 draw (against commission) in a addition to a $25,000 salary to represent Lady Manhattan on an exclusive basis only and discontinue carrying any other lines. You declined this offer at that time and on Monday, March 8th, in a phone conversation you asked me to reconsider my decision and keep you on a "season to season" basis predicated on a substantial increase in your sales figures.

Apparently, Larry, you missed the point of our initial conversation. Our goal is to restructure the sales force and return to our former policy of exclusivity. I believe that a return to this policy will be an important factor toward building back the position that Lady Manhattan once enjoyed. And, Larry, as a long time employee of Lady Manhattan, who previously functioned in that same manner, you can well understand it's effectiveness.

Therefore after reconsidering your suggestion I must again ask for your immediate reply.

Yours truly,

s/Bob Guberman

"Your present target for the fall 82 season is $350,000. Excluding Richs & Davidsons." Guberman testified that the major stores were excluded from the target figure because the projections for those accounts were as yet unknown.

A typed draft of a letter dated March 10 did not describe the company's offer or refer to poor sales in Goldstein's territory.

Meanwhile, the company had deleted Goldstein's name from the official brochure for its 1982 fall fashion season, which was mailed to 6,830 customers on March 9 and 10, including 245 in Goldstein's territory. The brochure listed other sales representatives by name. Goldstein's name had been included on the 1981 brochure.

On March 12, 1982, Guberman wrote a letter to Goldstein advising him that his employment would be terminated effective March 15. The letter was not mailed until March 15. By that time Guberman had already hired Eiseman to replace Goldstein. Eiseman was to be an exclusive sales representative for Lady Manhattan in Goldstein's territory, and he was also to receive the Rich's and Davison's accounts.

Goldstein did not receive Guberman's March 11 letter until March 15. He sent an immediate mailgram accepting the company's offer. When Guberman received the mailgram agreeing to his terms, he apparently rescinded Goldstein's March 15 termination and withdrew his offer to hire Eiseman.

Goldstein had not received the termination letter before he set out for New York for a company sales meeting, scheduled for March 19, 1984. At the conclusion of the sales meeting, Goldstein met with Guberman and Imber. Goldstein recalled that other salesmen had informed him that, while they had returned to exclusivity, they had also had their major accounts returned to them. He stated that in his meeting with Guberman and Imber, he complained that he was not being given the same consideration as other salesmen, whereupon Guberman became angry, accused Goldstein of never intending to accept the job and told Goldstein that he was fired.

Guberman and Imber, on the other hand, recalled that Goldstein, having been assured that he would receive back the Rich's and Davison's accounts, nevertheless informed them that he had decided he was not going to give up his outside accounts. He adhered to this position even after he had a telephone conversation with company chairman Lawrence C. Leeds, Jr. Leeds also testified that it was clear in his conversation with Goldstein that Goldstein understood he was to get back the Rich's and Davison's accounts. When Goldstein refused to commit himself to exclusivity, Guberman became irritated and terminated Goldstein's employment.

When Goldstein returned home to Birmingham, he found Guberman's March 12 letter of termination waiting for him.

Goldstein filed a charge with the Equal Employment Opportunity Commission ("EEOC") on June 21, 1982, alleging that his discharge and replacement with Michael Eiseman violated the ADEA. This suit followed on October 5, 1982.

B. *Plaintiff's Evidence of a Pattern of Discrimination*

Goldstein introduced evidence concerning the termination and replacement of other sales representatives. The evidence focused on a number of sales representatives who were replaced in 1982.

In March 1982, Robert Autenrieth, age 52, with 28 years of service, was replaced by Stan Blackman, age 43.

In September 1982, Milton Ran, age 53, was replaced by a Mr. Wein, age 48, who was in turn replaced by a Mrs. Norris, also age 48.

In March 1982, M. Berger, in his 40's, was replaced by Mr. Root, age 30.

In July 1982, Stan Ross, age 60, was replaced by a Mr. Rosenberg, age unknown.

In March 1982, W. Stepka, whose age was estimated at 33, was replaced by Mr. Platt, age 43.

In the same month, R. Castillo, who may have been 35, was replaced by Mr. Horowitz, age 38. Horowitz, in turn, was replaced by Mr. Goodman, age 38, who was himself replaced in June 1983 by Ms. Stein, age 25.

In July 1983, R. Queal, age 36, died and was replaced by Mr. Wooten, age 28, and Mr. Norman, age 43.

There was also evidence that W. Graves, age 50–60, was replaced by Mr. Platt, age 43, and Mr. Blackman, age 45.

The plaintiffs also introduced over defendant's objection a list of all sales representatives employed [4] by Manhattan from 1976 until the time of trial, including ages, dates of hire and dates of termination.[5] The list revealed a fairly high turnover during the years in question. Two employees over 50, Goldstein and Autenrieth, were shown to have been terminated in 1982. Two others, Robert Hone, and William Bennett, were shown to have been kept on from 1979 through 1983. The average age of employed sales representatives increased from 37.3 in 1979 to 41.7 in 1983. There was a slight decline from 1981, when the average age was 41, to 1982, when it was 40.6.

## C. *Lost Earnings*

Goldstein testified that, although he continued to sell his outside lines after his discharge, the Lady Manhattan line had been his "entree" with his customers, and that his inability to offer Lady Manhattan products after March 1982 adversely affected the saleability of his other lines. Moreover, the sales of all his lines had benefited from the choice location of the Manhattan space at the Atlanta Apparel Mart. After his termination, Goldstein was

forced to move to another location which was far less desirable.

The plaintiff's expert, Dr. George Ignatin, an economics professor, estimated that Goldstein's net lost earnings from both Manhattan and his outside lines since his termination totalled $147,300. Dr. Ignatin's projections of Goldstein's lost earnings from Manhattan were based on his earnings in 1980, 1981 and 1982. He assumed that Goldstein would not have had the Rich's and Davison's accounts if he had remained with the company.

## D. *The Judgment Below*

In his closing argument, Goldstein's counsel asked the jury to find that Goldstein had suffered lost earnings in the amount calculated by Dr. Ignatin, $147,300. The jury returned with a verdict for Goldstein, answering the following special interrogatories in the affirmative:

1. Do you find that age was the determining factor in the decision of the employer to terminate the employee?

2. If the answer to question no. 1 is yes, do you find that the act of discrimination was willful as defined to you by the court?

The jury also awarded Goldstein $175,000 for lost wages and benefits. The district court subsequently ordered a remittitur to reduce the jury's award down to $147,300, to conform with the findings of Dr. Ignatin. Because the jury had found willfulness, the court awarded liquidated damages in an amount equal to the reduced award. The court also ordered Goldstein's immediate reinstatement to his former position, despite Goldstein's contention that

---

**4.** Many of the company's sales representatives, including some of those named above, were independent agents rather than employees of Manhattan. Goldstein was an employee.

**5.** The employer objected to the introduction of this list, which it had prepared in response to an interrogatory, on the ground that it was irrelevant and legally insufficient to constitute statistical evidence of discrimination. We conclude that, while this list would certainly have been

inadequate to support a statistical case of age discrimination, it was at least relevant to the issue of whether there was a pattern of replacing older sales representatives with younger ones in 1982 and 1983, as Goldstein alleged. It was not an abuse of discretion to admit it and to make it available to the jury. Indeed, since, on balance, the list appears to negate the existence of such a pattern, we can hardly see how the employer was prejudiced by its introduction.

this was a proper case for an award of front pay in lieu of reinstatement.

### ISSUES

1. Whether as a matter of law Goldstein was unable to establish a prima facie case of age discrimination because his replacement was also within the age group protected by the ADEA;
2. Whether Goldstein was entitled to recover as lost earnings reductions in his income from the outside lines;
3. Whether the evidence was sufficient to support the jury's finding of discrimination;
4. Whether the excessiveness of the jury's damage award, which was reduced by remittitur, required that the entire verdict be set aside;
5. Whether the district court abused its discretion in ordering Goldstein's reinstatement instead of awarding him front pay.

### DISCUSSION

A. *The Prima Facie Case*

The protections of the ADEA are limited to persons between the ages of 40 and 70. 29 U.S.C. § 631(a). This Circuit has adopted a variation of the four-part test articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) as the standard method of establishing a prima facie case of age discrimination:

> In order to establish a prima facie case of discrimination under this test, a plaintiff must prove (1) that he is a member of the protected group; (2) that adverse employment action was taken against him, *e.g.* discharge, demotion, failure to hire; (3) *he was replaced by a person outside the protected group;* and (4) he was qualified for the position for which he was rejected. [Emphasis added.]

*Pace v. Southern Railway System*, 701 F.2d 1383, 1386 (11th Cir.), *cert. denied,* — U.S. —, 104 S.Ct. 549, 78 L.Ed.2d 724 (1983); *Price v. Maryland Casualty Co.*, 561 F.2d 609, 612 (5th Cir.1977).

Manhattan argues that, since this is a replacement case, Goldstein could make out a prima facie case of age discrimination only if he was replaced by a person under 40. Since Eiseman was 46 years old at the time he replaced Goldstein, the employer contends that Goldstein failed as a matter of law to prove his prima facie case.

This Court has repeatedly cautioned against an overly strict application of the *McDonnell Douglas/Price* test, noting that it is "not the alpha and omega of possible tests in the age discrimination context." *Pace*, 701 F.2d at 1387; *McCorstin v. United States Steel Corp.*, 621 F.2d 749, 753 (5th Cir.1980). A mechanistic approach in the selection of criteria necessary to prove a prima facie case of age discrimination is frequently inappropriate because it ignores the basic realities of this form of discrimination. Age discrimination is qualitatively different from race or sex discrimination in employment, because the basis of the discrimination is not a discreet and immutable characteristic of an employee which separates the members of the protected group indelibly from persons outside the protected group. Rather, age is a continuum along which the distinctions between employees are often subtle and relative ones. Nevertheless, age differences may be very real distinctions from the perspective of an employer, for whom an employee's age is a constantly shifting factor in the determination of his worth to the company. As this Court observed in *McCorstin:*

> Seldom will a sixty-year-old be replaced by a person in the twenties. Rather, the sixty-year-old will be replaced by a fifty-five-year-old, who, in turn, is succeeded by a person in the forties, who also will be replaced by a younger person. Eventually, a person outside the protected class will be elevated but rarely to the position of the one fired. . . .

> . . . . .

> [B]ecause the discrimination involves age, rather than sex or race, a require-

ment that the replacement be from a nonprotected group fails to take the reality of the working place into account. Because of the value of experience rarely are sixty-year-olds replaced by those under forty. The replacement process is more subtle but just as injurious to the worker who has been discharged. That the person is replaced by a person ten years younger rather than twenty years does not diminish the discrimination; the subtlety only tends to disguise it.

621 F.2d at 754.

The mere fact that one employee is replaced with another who is younger certainly does not, without more, give rise to an inference that age was even considered in the decision to dismiss or demote the first employee. Historical experience does often lend support to suspicions that replacements of black with whites or women with men are not coincidental. However, whenever employees are replaced, their replacements are invariably either older or younger than they are, and the distinctions are usually unimportant.

Congress recognized this fact when it concluded that the protections of the ADEA should be limited to persons over 40, since historically it has been within this age group that employees have been displaced largely on account of their age because of the perceived decline in their long-range value to their employers. The *McDonnell Douglas/Price* test simply reflects a similar recognition that it is more likely in the ordinary nature of things that age played a part in a decision to replace an employee when his replacement is younger than 40 than when the replacement is himself within the protected age group.

 Whether a prima facie case of discrimination has been shown in any given situation is essentially a factual question. The inquiry is whether an ordinary person could reasonably infer discrimination from the facts shown if those facts remain unrebutted. *See McCorstin,* 621 F.2d at 754. While the *McDonnell Douglas/Price* test is an approved method of making a prima facie case, this Court has considered alter-

native proofs where a *McDonnell Douglas/Price* analysis was plainly inappropriate. Such is the case in reduction-in-force situations, where replacement is simply not in issue. *See McCuen v. Home Insurance Co.,* 633 F.2d 1150, 1151 (5th Cir., Unit B, 1981); *McCorstin,* 621 F.2d at 754.

In *Pace,* we identified other situations where a prima facie case of age discrimination could be established without showing that the plaintiff was replaced by a person under 40. We determined that a prima facie case could, for example, be made with statistical proof of a pattern of discrimination against older employees. 701 F.2d at 1388. We also noted the Ninth Circuit's conclusion in *Douglas v. Anderson,* 656 F.2d 528 (9th Cir.1981), that the discrimination prong of the prima facie case could be established by a showing that a plaintiff "was replaced by a substantially younger employee with equal or inferior qualifications." *Id.* at 533. We observe that, in *Douglas,* there had also been substantial evidence of the plaintiff's qualifications. *Pace,* 701 F.2d at 1390.

In *Pace,* we were confronted with a 51-year-old employee who had been demoted and replaced by another employee who was 49 years old. There was considerable evidence that the demoted employee was not qualified for the position from which he had been demoted. He attempted to rely on statistical evidence showing that other reassignments made at approximately the same time reflected a pattern of age discrimination. He also presented evidence of the percentage of persons within the protected age group among employees who were promoted and among those who were demoted during various time periods. This Court concluded that the evidence of the reassignments simply did not indicate a pattern of discrimination, particularly since the plaintiff was the only employee, whether in or out of the protected group, who had been demoted. As to the percentages, we found that the plaintiff had failed to relate those percentages to the percentage of protected workers in the work force as a whole. 701 F.2d at 1388–89.

We believe that the statistical evidence proffered by Goldstein concerning other sales representatives is only slightly more convincing than the statistics relied upon in *Pace.* The evidence showed that four other sales representatives in the protected age group were replaced by persons younger than themselves. Some of those replacements were within the protected age group, but others were not. However, the evidence also indicated that three sales representatives younger than 40 were replaced by persons older than themselves. One other employee within the protected age group was replaced by a person whose age was unknown. As for the list of sales representatives employed by the company with ages, dates of hire and dates of termination, the lists simply did not demonstrate any sort of a "youth movement," whereby the company sought to enhance its image with its customers by utilizing younger sales representatives. It may well have been that age played a part in some of the company's employment decisions. However, there is simply no evidence that this was a widespread practice. Thus, we conclude that the statistical evidence proffered by Goldstein does not satisfy the discrimination prong of his prima facie case.

We do, however, believe that there is sufficient circumstantial evidence surrounding his own discharge to support a reasonable inference that he was discharged at least in part because of his age. In the first place, Goldstein was replaced by a person who was 14 years younger than he was. Thus, the discrepancy between the age of the replaced employee and the age of the replacing employee was far more substantial here than in *Pace,* where the replacing employee was only two years younger than the plaintiff. As noted in *McCorstin,* it is likely that, in choosing a replacement for a 60-year-old employee who is determined to be too old to continue with the company, the employer would select someone who has a more appropriate balance of age and experience, and that only someone who is over 40 years old is likely to have had the sort of experience to enable him to fill the position vacated by the 60-year-old. *See id.,* 621 F.2d at 754.

Moreover, the evidence is overwhelming that Goldstein was highly qualified for his position. Up until the end of his employment, he was apparently one of Lady Manhattan's most successful sales representatives, even when he was devoting part of his efforts to non-competing outside lines. *Cf. Douglas,* 656 F.2d at 533.

Finally, Goldstein has presented direct evidence that he was singled out for disparate treatment. While it may well be true that Guberman and Imber planned a phased return to exclusivity regime and that Goldstein's territory was one of six selected for immediate exclusivity, the jury could have accepted Goldstein's evidence which indicated that he was the only sales representative marked for exclusivity who was not offered back his major accounts.

These facts convince us that Goldstein presented sufficient evidence to satisfy the discrimination prong of his prima facie case of age discrimination even though the employee who replaced him was himself within the protected age group.

B. *Sufficiency of the Evidence*

In ascertaining whether the evidence was sufficient to support the jury's verdict, we inquire whether, in light of all the evidence, reasonable persons could, under any theory submitted to the jury, have resolved the dispute as the jury did. *Thompson v. Bass,* 616 F.2d 1259, 1267 (5th Cir.), *cert. denied sub nom. Thompson v. Turner,* 449 U.S. 983, 101 S.Ct. 399, 66 L.Ed.2d 245 (1980). We may not reweigh the evidence to reach our own conclusions about the correctness of the jury's decision. *Id.*

As noted previously, Goldstein introduced sufficient prima facie evidence of discrimination to warrant the submission of the case to the jury. This imposed on Manhattan the burden of articulating a legitimate non-discriminatory reason for Goldstein's discharge. *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 254, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981); *Horn v. Bibb County*

*Commission,* 713 F.2d 689, 691 (11th Cir. 1983). Manhattan did this by claiming that Goldstein was fired, not because of his age, but because of his refusal to return to an exclusive status.

The burden thus returned to Goldstein to prove by a preponderance of the evidence that age discrimination was a reason for his discharge. He may do this "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Burdine,* 450 U.S. at 256, 101 S.Ct. at 1095; *Horn,* 713 F.2d at 691.

Goldstein presented both testimonial and documentary evidence that, unlike other sales representatives who were required to return to exclusive status, he alone was not offered the major store accounts in his sales territory. Guberman and Imber both testified that the company's policy was to return the major store accounts to the sales representatives. They and Leeds all testified that they believed this offer had been extended to Goldstein as well. Guberman did acknowledge that Goldstein raised the issue of the major stores during his telephone conversations with Guberman on both March 4 and March 8.

Goldstein, however, testified that Guberman never offered to return the major accounts to him, despite Goldstein's protestations that a return to exclusivity without those accounts was unfair. Moreover, Guberman's letter of March 11, which detailed the terms of his offer, said nothing about Rich's and Davison's. It only referred to the proposed $25,000 salary/$25,000 draw arrangement. Guberman's only written reference to the major accounts appears to have been the handwritten draft in which he gave Goldstein a target sales figure exclusive of Rich's and Davison's.

While Guberman insisted that this was simply a reference to the fact that the projections for those stores were not yet available, the jury was certainly entitled to draw the contrary inference that the language in the draft was a reiteration of a previously stated position that Rich's and Davison's were not included in the offer. Likewise, in view of Goldstein's clear concern about the Rich's and Davison's accounts, the jury was entitled to infer that those accounts would have been mentioned in the March 11 letter if in fact they were to be included in Guberman's offer.

The jury was also entitled to view other actions on the employer's part as casting doubt on the genuineness of its advanced reason for Goldstein's termination. Guberman was already sounding out Goldstein's replacement, Eiseman, the same night that he informed Goldstein that Goldstein would have to return immediately to an exclusive status. Moreover, the exclusion of Goldstein's name from the company's official brochure for the fall fashion season, which was distributed to customers on March 9 and 10, was evidence from which the jury could conclude that, at the very least, a decision had been made to discharge Goldstein at some time prior to the March 8 conversation and probably even before the March 4 conversation.

The employer offered explanations for all of these actions, which were not directly rebutted. The jury was not required to accept these explanations but was entitled to draw its own conclusions from the documents or actions in question.

Finally, there was little, if any, evidence that Goldstein's performance as a sales representative for Manhattan was less than satisfactory. The jury could find that such dissatisfaction as Guberman and Imber may have had with his sales in 1980 and 1981 were attributed to his non-exclusive status.[6] The only reason they gave for his discharge was his refusal to return to ex-

---

6. In a letter to the company's attorneys, dated July 26, 1982, Donald Kallman, Manhattan's vice chairman of the board and executive vice president, claimed that Goldstein "was discharged for poor performance and not age dis- crimination." Because of the clear inconsistency between this letter and the company's stated reason for Goldstein's discharge, the company insists that Kallman's letter does not reflect the company's true position.

clusivity under terms which the jury implicitly found to be discriminatory. They replaced a man who had 22 years with the company and one of its most successful sales records with another man 14 years younger who had no experience with Lady Manhattan.

We believe that there was sufficient evidence from which a reasonable jury could have concluded that the reason articulated by the employer for Goldstein's discharge was a pretext for discrimination and that Goldstein's age was a consideration in the decision to terminate him. We thus affirm the jury's finding of discrimination.

### C. *Recovery of Lost Earnings from Outside Lines*

Manhattan next contends that its back pay liability should be limited to his lost income from Manhattan and should not include earnings which he may have lost from his outside lines as a result of his termination. Manhattan observes that only $96,700 of the $147,300 calculated by Dr. Ignatin represents lost income from Manhattan and submits that this figure should be offset by actual earnings of $73,000, leaving a maximum liability of only $23,700.

Whether Goldstein is precluded as a matter of law from recovering his lost earnings from his outside lines depends on whether those earnings are in the nature of compensatory or general damages or are instead job-related benefits which would be recoverable as part of a back pay award.

We note that, while the ADEA does refer to the availability of "such legal or equitable relief as may be appropriate to effectuate the purposes of this chapter," 29 U.S.C. § 626(b), this Court has held that this provision is to be read in light of the reference to the remedies provided under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 216 and 217, and that neither punitive damages nor compensatory damages for pain and suffering are recoverable under the ADEA. *Dean v. American Security Insurance Co.,* 559 F.2d 1036, 1038 (5th Cir.1977), *cert. denied,* 434 U.S. 1066, 98 S.Ct. 1243, 55 L.Ed.2d 767 (1978).

■ However, back wages are ordinarily recoverable, *see Hodgson v. First Federal Savings & Loan Association,* 455 F.2d 818, 825 (5th Cir.1972), as are fringe benefits. *See, e.g., Blackwell v. Sun Electric Corp.,* 696 F.2d 1176, 1185–86 (6th Cir.1983). This is clear from the House Conference Report attached to the 1978 amendments to the ADEA, which construes the "amounts owing" under 29 U.S.C. § 626(b) as including "items of pecuniary or economic loss such as wages, fringe, and other job-related benefits." H.R.Conf.Rep. No. 95–950, 95th Cong., 2d Sess. 13, *reprinted in* 1978 U.S. Code Cong. & Ad.News, 504, 528, 535.

■ We note that this Court has held that a Title VII plaintiff is entitled to recover such lost work benefits as constitute "concomitants of employment." *Walker v. Ford Motor Co.,* 684 F.2d 1355, 1364 (11th Cir.1982). We believe that a similar criterion is appropriate in determining whether a particular economic loss occasioned by an ADEA violation is recoverable under that Act.

■ Whether a particular economic benefit is a concomitant of the employment relationship depends on the contemplation of the parties when they agreed upon the terms and conditions of employment. In this case, Manhattan agreed that non-exclusivity was to be one of the terms and conditions of Goldstein's employment following the withdrawal of the major store accounts. Clearly the commissions which Goldstein might earn from the representation of non-competing outside lines were contemplated as a substitute for the commissions which Manhattan was saving by taking back the accounts with Rich's and Davison's. Moreover, Manhattan had agreed that Goldstein could sell his outside lines from Manhattan's showroom at the Atlanta Apparel Mart.

We believe that the right to sell non-competing outside lines and to use the Lady Manhattan line as a "headliner" or "entree" with which to attract buyers to the

other lines was clearly a concomitant or fringe benefit of Goldstein's employment. Thus, the commissions which he lost from these lines, if provable with reasonable certainty, were properly recoverable.

■ Manhattan insists that the lost earnings from the other companies were too remote and speculative to form the basis of an award. We do not agree. Goldstein introduced evidence of his earnings history from three specific companies whose products he had sold alongside his Lady Manhattan line. Dr. Ignatin applied the same method of projecting anticipated earnings from these companies as he did with the lost earnings from Manhattan. Since the base figures represented earnings which depended on the availability of the Lady Manhattan line as a "headliner," the projections thus estimated what Goldstein would have earned from his outside lines had he been permitted to stay on with Manhattan on a non-exclusive basis. Thus, we conclude that the amount calculated by Dr. Ignatin was a reasonably certain and reliable estimate of the earnings which Goldstein lost from his outside lines as a result of his discharge from Manhattan.

■ As a preliminary matter, we believe that Goldstein was entitled to claim damages based on his pre-termination earnings. He had two possible measures of lost earnings: projections based on his actual earnings prior to discharge or the earnings which he would have received had the company made him the same offer that the other sales representatives received. The first included the outside accounts but not Rich's and Davison's. The second would have included the major accounts but not the outside ones.

Under the facts of this case, we believe that either of these alternatives was an appropriate measure of damages. The jury found that Goldstein had been discharged because of his age. This conclusion required a finding that Goldstein's version of Guberman's offer was correct—a return to exclusivity but without the major accounts.

The company could have made either of two non-discriminatory offers: to continue under the existing non-exclusive arrangements or to return to exclusivity with the major accounts. In fact, neither of these options was offered. Both are hypothetical and the jury was not required to conclude that the second was the only non-discriminatory alternative which would have been available to Goldstein. Instead, it was entitled to find that Goldstein would have been kept on under the existing arrangement if the company had wanted to keep him at all. At that time, 14 territories remained nonexclusive, and eight were still non-exclusive in 1984. Thus, we believe it was proper to measure Goldstein's damages on the basis of a hypothetical continuation of his pretermination earnings.

### D. *Excessiveness of the Jury's Award*

The employer contends that the jury's award of $175,000 to Goldstein so substantially exceeded the evidence of damages as to demonstrate that the jury was governed by passion and prejudice in reaching its verdict. It thus insists that a remittitur reducing the award to the maximum established by the evidence was insufficient to cure the prejudice resulting from a "runaway" jury.

■ It is true that a grossly excessive award may warrant a finding that the jury's verdict was swayed by passion and prejudice and thus necessitate a new trial. *See Edwards v. Sears, Roebuck & Co.,* 512 F.2d 276, 283 (5th Cir.1975). However, a new trial should be ordered only where the verdict is so excessive as to shock the conscience of the court. *Thompson v. National Railroad Passenger Corp.,* 621 F.2d 814, 827 (6th Cir.), *cert. denied,* 449 U.S. 1035, 101 S.Ct. 611, 66 L.Ed.2d 497 (1980); *Williams v. Steuart Motor Co.,* 494 F.2d 1074, 1085 (D.C.Cir.1974); *Massachusetts Bonding & Insurance Co. v. Abbott,* 287 F.2d 547, 548 (5th Cir.1961). Whether a new trial is required is within the sound discretion of the district court, and a refusal to grant a new trial will not be overturned unless there has been a clear abuse

of discretion. *Hedrick v. Hercules, Inc.*, 658 F.2d 1088, 1095 (5th Cir., Unit B, 1981).

The district court considered the jury's verdict in light of all the evidence and concluded that the excessiveness of the award warranted a remittitur but not a new trial. We do not believe this was an abuse of discretion. The award exceeded the specific proofs by approximately 20 percent. However, Dr. Ignatin emphasized repeatedly that he considered his estimates of Goldstein's lost earnings to be on the conservative side and that Goldstein's damages may have been greater. In light of this, we do not believe that the admitted excessiveness of the jury's award reflects improper passion or prejudice or that it shocks the conscience.

In general, a remittitur order reducing a jury's award to the outer limit of the proof is the appropriate remedy where the jury's damage award exceeds the amount established by the evidence. *See Howell v. Marmpegaso Compania Naviera, S.A.*, 536 F.2d 1032, 1034–35 (5th Cir. 1976); *Natco, Inc. v. Williams Brothers Engineering Co.*, 489 F.2d 639, 641 (5th Cir.1974).

This is not a case where a jury could have found liability on more than one count, each of which involved different elements of damages, and failed to indicate on which basis it found liability. In such a case, an excessive damage award may require a new trial on both liability and damages. *Jamison Co. v. Westvaco Corp.*, 526 F.2d 922, 935 (5th Cir.1976). Where, however, there is only one basis for liability alleged, then all of the damages evidence relates to that count and the trial court may base a remittitur order on the maximum amount proved. This is precisely what the district court did. We thus affirm the order of a remittitur in lieu of a new trial.

### E. *The Reinstatement Award*

Goldstein contends that the district court abused its discretion in ordering his reinstatement with Manhattan and denying an award of front pay in lieu of reinstatement.

Goldstein argues that reinstatement is an inappropriate remedy in this case for several reasons. Chiefly, he argues that the litigation of this suit has engendered such ill feeling between himself and the persons who would be his immediate superiors in the company that it would be impossible for him to function as an employee of Manhattan again. He also contends that his sales activities since his discharge have been in other types of women's apparel and that he has lost touch with most of the buyers with whom he dealt when he was representing Lady Manhattan.

On the other hand, Imber, who, as Lady Manhattan's national sales manager, would be Goldstein's immediate boss, testified that he would be willing to have Goldstein return as an exclusive salesman with the major accounts included. He foresaw little difficulty in re-establishing Goldstein's contacts with Lady Manhattan's accounts in view of his time in the territory.

It is clear from the language of the ADEA's enforcement provision, that reinstatement is the preferred remedy for discriminatory discharge:

[T]he court shall have jurisdiction to grant such legal or equitable relief as may be appropriate to effectuate the purposes of this [Act], including without limitation judgments compelling employment, reinstatement or promotion. . . .

29 U.S.C. § 626(b).

The determination of whether reinstatement is an appropriate remedy lies within the sound discretion of the district court. *Hedrick v. Hercules, Inc.*, 658 F.2d 1088, 1095 (5th Cir., Unit B, 1981). More generally, the selection of remedies for an ADEA violation is a matter of the trial court's discretion, so long as the relief granted is consistent with the purposes of the Act. *Leftwich v. Harris-Stowe State College*, 702 F.2d 686, 693 (8th Cir.1983).

This Court has expressly held that an award of front pay—*i.e.*, prospective lost earnings—may be an appropriate remedy

in an age discrimination suit because reinstatement would be impracticable or inadequate. *O'Donnell v. Georgia Osteopathic Hospital, Inc.,* 748 F.2d 1543, 1551 (11th Cir.1984). *See, also, EEOC v. Prudential Federal Savings & Loan Association,* 741 F.2d 1225, 1231 (10th Cir.1984); *Gibson v. Mohawk Rubber Co.,* 695 F.2d 1093, 1100 (8th Cir.1982); *Cancellier v. Federated Department Stores,* 672 F.2d 1312, 1319 (9th Cir.), *cert. denied,* 459 U.S. 859, 103 S.Ct. 131, 74 L.Ed.2d 113 (1982). *But see Kolb v. Goldring, Inc.,* 694 F.2d 869, 874 n. 4 (1st Cir.1982) (no recovery under ADEA for future economic loss).

■ Front pay may be particularly appropriate in lieu of reinstatement where discord and antagonism between the parties would render reinstatement ineffective as a make-whole remedy. *See Cancellier,* 672 F.2d at 1319.

■ Since, as stated, the selection of remedies is discretionary with the trial court, we find no abuse of discretion in the district court's conclusion that reinstatement rather than front pay was the appropriate remedy in this case. We believe the district court was entitled to rely on Imber's testimony that he would be willing to have Goldstein back and that Goldstein would be able to function effectively as Lady Manhattan's sales representative in his old territory.

We note that the order of reinstatement directed that Goldstein be rehired as Manhattan's exclusive sales representative in Alabama, Georgia and the Florida panhandle, and that Manhattan was to maintain no "house accounts" in that territory. The order further provided that the reinstatement was to "be on terms and conditions as advantageous to plaintiff as those terms and conditions between defendant and defendant's present sales representatives having comparable sales territories." In addition, Manhattan was ordered to restore to Goldstein all pension benefits to which he would have been entitled if he had not been terminated.

We conclude that the district court's reinstatement order coupled with the damages award for lost earnings will make Goldstein substantially whole. We thus affirm the reinstatement order and the denial of front pay in lieu thereof.

AFFIRMED.

JOHNSON, Circuit Judge, concurring in part and dissenting in part:

Although I concur in all other parts of the majority opinion, I must dissent from that section which holds it appropriate to include in compensatory damages the decrease in "outside earnings" that Goldstein suffered following his termination by Manhattan. The connection between Goldstein's work for Manhattan and his sale of "outside" lines is too tenuous, as an analytic matter, to justify inclusion under the relevant case law. *See Blim v. Western Electric Co.,* 731 F.2d 1473 (10th Cir.1984); *Loeb v. Textron, Inc.,* 600 F.2d 1003 (1st Cir.1979) (demonstrably close connection required). The simple fact that Manhattan gave Goldstein the *opportunity* to undertake "outside" sales does not render his income from this activity a fringe benefit of his employment with Manhattan. A benefit can be described as concomitant or fringe only to the extent that it derives directly from some feature of Goldstein's employment with Manhattan. Such a connection might be established by the fact that Manhattan permitted Goldstein to use its name and showroom to bring in customers whom he could then interest in his "outside" lines. But the record demonstrates that these benefits had a smaller role in Goldstein's sale of "outside" lines than Goldstein suggests. In the last years of Goldstein's non-exclusive contract, for example, his sales in "outside" lines rose substantially while his sales in Manhattan products decreased. This suggests that the outside lines were more attractive to many customers than the Manhattan lines, and that the Manhattan products may not have been the factor that encouraged customers to buy from Goldstein. And while Goldstein used a Manhattan showroom to exhibit his other products, his ability to

obtain another showroom for his fall show when he was terminated by Manhattan demonstrates that this factor was not determinative either.

Even beyond the tenuousness of the connection, it would be impossible to document the decrease in "outside earnings" with the precision which has been demanded by the courts in this area of the law. *Compare Kolb v. Goldring, Inc.,* 694 F.2d 869 (1st Cir.1982) (decrying speculative damages and excluding benefits incapable of precise valuation), *with Kelly v. American Standard, Inc.,* 640 F.2d 974 (9th Cir.1981) (including benefits capable of precise calculation). Because this "outside income" can only be described as a fringe benefit of employment to the extent that it was earned because of the resources or facilities that working for Manhattan made available to Goldstein, what would have to be documented is not simply the decrease in "outside earnings", but the *decrease attributable to the fact that Goldstein could no longer use Manhattan's name, showroom or products to attract potential buyers to his "outside" lines.* The impossibility of documenting this portion of lost income with any precision demonstrates that it is too speculative to be included within the category of lost benefits.