**Louis C. INGRAM**

v.

**COX COMMUNICATIONS, INC., Formerly Known As Cox Broadcasting Corporation, d/b/a WSB–TV.**

Civ. No. C83–624.

United States District Court,
N.D. Georgia,
Atlanta Division.

June 5, 1985.

Robert N. Meals, Meals & Parks, P.C., Atlanta, Ga., for plaintiff.

Brent L. Wilson, Elabree, Thompson & Trapnell, Atlanta, Ga., for defendant.

## ORDER

ORINDA D. EVANS, District Judge.

This case under the Age Discrimination in Employment Act is before the court for certain findings and entry of final judgment. The issues of liability and backpay were tried to a jury on February 19–25, 1985. The jury responded to special interrogatories, finding that Plaintiff's age was a determinative factor in the employer's decision of which Plaintiff complains. The jury found that the discriminatory decision caused Plaintiff to lose $16,500 in income.

Prior to trial, the court announced the reservation of certain matters which would be decided by it in the event Plaintiff prevailed on the issue of liability. The reserved matters are Plaintiff's claims for: (1) reinstatement; (2) front pay; (3) prejudgment interest on the backpay award; (4) adjustment of pension benefits (based on a percentage of the backpay award); and (5) an award of attorney's fees.

To recapsule the facts, at relevant times Plaintiff has been and still is a commission paid account executive for WSB–TV ("WSB") in Atlanta. WSB (also known as Channel 2) is owned by Defendant Cox Communications, Inc. Its account executives sell time on Channel 2 to companies desiring to advertise their products or services. In some cases, this is accomplished through advertising agencies which represent such companies. WSB assigns and reassigns accounts periodically to its account executives, according to its perception of who can best service the account.

For many years prior to mid-1982, WSB assigned the McCann-Erickson account to Mr. Ingram. McCann-Erickson is a large, prestigious advertising agency based in Atlanta. It handles the Coca-Cola account and other large corporate accounts. Mr. Ingram would negotiate with McCann-Erickson executives to try to get them to place clients' ads on WSB–TV. At the time of the events in question, Plaintiff was in his early sixties. His immediate supervisor was Mrs. Grace Gilchrist, who was in her mid-forties. Mrs. Gilchrist was hired in late 1980 for the specific purpose of overhauling and upgrading WSB's local sales department.[1]

In December, 1980, WSB had a 30% share of the Atlanta viewing market, but it only was obtaining a 24% share of estimated local TV advertising revenues. Because the General Manager had set a goal of achieving a 33% share of the viewing audience,[2] Mrs. Gilchrist set a sales goal for her local account executives of 33% of available advertising revenues. At this time, account executives' compensation arrangements were changed to a commissions only basis. Frequent staff meetings were held to encourage better perform-

---

1. Mrs. Gilchrist's hiring itself was part of an overall effort to upgrade station sales. This effort began in January, 1980, when Fred Barber became General Manager of WSB. Noting that WSB had lower local sales than its share of the viewing audience would indicate, he undertook a number of personnel changes. The existing General Sales Manager was replaced by John Garwood, who was hired away from one of Defendant's competitors in Detroit, Michigan. Mr. Garwood then replaced the incumbent Lo-

cal Sales Manager with Mrs. Gilchrist. She had worked with Mr. Garwood at his former place of employment. When Mrs. Gilchrist assumed the position of Local Sales Manager, she replaced four of the local sales department's account executives. Mr. Ingram was among those retained.

2. Two other local TV stations compete with WSB–TV.

ance. During 1981, WSB did increase its share of both viewership and available advertising revenues.

The evidence at trial showed that advertising time is frequently sold by Atlanta TV stations on a quarterly basis. Normally, the fourth quarters is a high-revenue quarter, because companies tend to advertise heavily then.

At the end of the third quarter of 1981, Mr. Ingram negotiated a contract with McCann-Erickson for the upcoming fourth quarter. Although WSB then had a 29% viewing share of the Atlanta audience, McCann-Erickson committed only 8% of its local TV advertising budget to WSB under that contract.

Mr. Ingram reported this admittedly disastrous turn of events to Mrs. Gilchrist.[3] She attempted to reopen negotiations with McCann-Erickson, but was unsuccessful.[4] She reported the matter to Mr. Garwood. He felt, in light of Mr. Ingram's failure to give management advance notice of problems with the buy, that he should be terminated.

The matter was presented to Fred Barber, General Manager of WSB. Mr. Barber pointed out that Mr. Ingram was in his sixties and had worked for the station for many years. He vetoed Mr. Garwood's suggestion that Mr. Ingram be fired. He told Mrs. Gilchrist to switch the account to another executive if she wished to do so.

Mrs. Gilchrist did not immediately reassign the McCann-Erickson account, although she told Mr. Ingram in March 1982 that this was a possibility. Mr. Ingram retained the account for the first and second quarters of 1982, at which respective times WSB obtained 34% and 22% shares of McCann-Erickson's available business. Mrs. Gilchrist was still dissatisfied[5] and in late June 1982, she reassigned the account to David Beckman, a 27 year old account executive.[6] During the interview with Mr. Ingram in which he was informed of the account switch, Mrs. Gilchrist commented that she felt Mr. Ingram's health was being adversely affected by tensions associated with handling the McCann-Erickson account. She assigned Mr. Ingram new accounts which had been switched from other account executives. Mrs. Gilchrist testified she chose these accounts by reference to their previous earnings records. She testified that she selected accounts which, when added to Mr. Ingram's other accounts, plus his own estimate[7] of new business he would bring in, would yield Mr. Ingram commissions roughly equal to those he had been receiving. The "substitute" accounts were the accounts of three large Atlanta churches, and the International House of Pancakes. The 1982 revenue to WSB from these accounts was about $360,000. McCann-Erickson had produced revenue of around $480,000 for WSB in 1981; it wound up producing 1982 revenue of over $800,000.

In 1983, Mr. Ingram also earned commissions from nine new accounts which he brought to WSB. The sales revenue produced by these accounts in 1983 was about $100,000. At the same time, however, the largest of the "substitute" accounts Mrs. Gilchrist had given Mr. Ingram in mid-1982

---

3. Mr. Ingram testified that the station's high rates were the main reason the account was undersold. WSB countered with testimony that these rates had not impaired the performance of other account executives.

4. The evidence at trial showed that McCann-Erickson had assigned a different buyer to negotiate the fourth quarter contract from the one Mr. Ingram had previously dealt with. The buyer's supervisor refused to renegotiate the contract but told Mrs. Gilchrist she would give the account more oversight in the future, and would let her know in advance if there were problems.

5. Mrs. Gilchrist testified that during the spring of 1982 she spent an undue amount of time working on the account herself. This testimony was controverted by Plaintiff's witnesses. There was some evidence suggesting discord between Mr. Ingram and Mrs. Gilchrist during this time frame, although neither side argued this was so.

6. The third quarter McCann-Erickson buy was handled partly by Mr. Ingram and partly by Mr. Beckman.

7. This estimate had been noted on a planning sheet turned in by Mr. Ingram.

(First Baptist Church, producing revenue of $209,000 in 1982) discontinued advertising on WSB. Also, in 1984 International House of Pancakes failed to renew.

The evidence at trial showed without dispute that Mr. Ingram had the following income from WSB in each of the following years:

1977 – $36,606.48
1978 – 39,079.50
1979 – 43,524.73
1980 – 45,561.81
1981 – 53,320.91
1982 – 50,086.23
1983 – 51,188.37
1984 – 58,796.05

The evidence at trial did not reflect what incomes were earned by other WSB account executives during any of the years between 1977 and 1984. Also, since the trial occurred in February, 1985, the evidence did not reflect Mr. Ingram's income level for 1985.

The post-trial affidavit of Louis C. Ingram, offered in connection with Mr. Ingram's request for equitable relief now before the court, states that "every sales account executive in the local sales department at the television station who services a major advertising agency such as McCann-Erickson, Inc., J. Walter Thompson, or Darcy, McManus & Masius … generates almost twice the amount of net revenue (upon which our sales commission income is based) as a person such as myself who does not have responsibility for any major agency." Ingram Affidavit, ¶ 2. ·

The post-trial affidavit of Mrs. Grace Gilchrist indicates that during the first five months of 1985, Mr. Ingram has earned greater commissions than any other account executive at WSB. Specifically, during the first five months of 1985, he has earned $33,609.00. The same affidavit reflects that in March 1985, Mr. Ingram was assigned a new account which is estimated to produce $7,980 in commissions in addition to the $70,000 Plaintiff has otherwise been projected to earn this year.

The seeming inconsistency between the Ingram and Gilchrist affidavits may be resolved by the fact that different types of accounts carry different commission rates.[8] The evidence at trial showed without dispute that agency accounts carry substantially lower commission rates than so-called direct accounts (i.e., an account in which no advertising agency is involved). For example, agency accounts carried a 3.2% commission rate in 1982, a 3.2% rate until June 1983, and a 2.8% rate from that time until the present. At all times since 1980 to the present, however, direct accounts have carried a 10% commission rate, as have new business accounts (for the first year only).

Since mid-1982, McCann-Erickson has substantially increased its local television advertising expenditures. Therefore, although WSB's percentage of these revenues versus that of other local TV stations has not increased, its gross revenues from McCann-Erickson have, with concomitant benefits to the commission paid account executives who have handled that account.[9] WSB's sales revenue from McCann-Erickson exceeded $1,300,000 in 1984.

The decision which Plaintiff challenges in the instant suit is Defendant's decision to reassign the McCann-Erickson account to David Beckman. Having found that this decision was motivated by age discrimination, the jury awarded Mr. Ingram $16,500. Plaintiff now asks the court to order Defendant to reassign ("reinstate") the McCann-Erickson account to him or alternatively, award front pay until he regains the account. He asks the court to award prejudgment interest, order that a proper adjustment in his pension benefits be made based on a percentage of the backpay award, and make an award of reasonable attorney's fees and expenses.

**8.** The court cannot be certain because the record does not make it clear which of Mr. Ingram's accounts are "direct" accounts.

**9.** In 1984 the McCann-Erickson account was again reassigned, this time from David Beckman to Mike McCord.

### Claim for Reinstatement

Plaintiff's position is that since the jury determined that reassignment of the McCann-Erickson account was motivated by age discrimination, that the court should now act to direct Defendant to reassign the account back to Plaintiff. Defendant, on the other hand, contends that such an order would interfere unduly with management prerogatives. Defendant argues that reshuffling of agency accounts in the television advertising business is a routine business matter, of an ongoing nature, such that injunctive relief pertaining to particular accounts would be inappropriate.

 The court finds that directing Defendant to reassign the McCann-Erickson account to Mr. Ingram is not an appropriate form of relief. Certainly, it would not constitute a proper form of "reinstatement." "Reinstatement" within the context of discrimination litigation means reinstatement to a particular position, not restoration of particular aspects of Plaintiff's job. In this case Plaintiff has never lost his position with Defendant. At all relevant times he has been a commission paid account executive. The most significant attributes of Plaintiff's position—duties performed and income received—have not been shown with reasonable certainty to have changed significantly—at least, not on a presently continuing basis.[10] Therefore, the court cannot conclude that Mr. Ingram was demoted when the McCann-Erickson account was reassigned. Where there has been neither a termination nor a demotion, reinstatement is an inapplicable concept.

Even if reinstatement were an applicable concept, it does not appear that merely directing reinstatement of the McCann-Erickson account, standing alone, would be an equitable remedy. When Defendant switched that account from Plaintiff, it gave him substitute accounts. Furthermore, Plaintiff utilized some of the time he would have spent servicing the McCann-Er-

ickson account to obtain new business which has produced additional income for him. The court could not equitably superadd the McCann-Erickson account to these other accounts; a wholesale review and possible reshuffling of all of Plaintiff's assigned accounts would be necessary. Plaintiff has not suggested what reassignment mix would be equitable, and the court will not speculate about this matter. Therefore, the court DECLINES to direct "reinstatement" of the McCann-Erickson account.

### Front Pay

Plaintiff asks the court to consider front pay as an alternative to reinstatement. In other words, Plaintiff asks the court to award an increment of damages for future periods when he is not handling the McCann-Erickson account. This should be done, Plaintiff urges, by comparing his present earnings with those of David Beckman from the McCann-Erickson account. Defendant opposes such request, arguing that any such award would be unduly speculative.

 Front pay is a remedy sometimes utilized by courts where immediate reinstatement is not feasible, either because the position to which plaintiff seeks reinstatement is incumbered, see *Cancellier v. Federated Dept. Stores,* 672 F.2d 1312, 1319 (9th Cir.), *cert. denied,* 459 U.S. 859, 103 S.Ct. 131, 74 L.Ed.2d 113 (1982), or because plaintiff is justified in refusing reinstatement due to the circumstances, *e.g.,* an acrimonious relationship with the employer, *Goldstein v. Manhattan Industries, Inc.,* 758 F.2d 1435, 1449 (11th Cir. 1985); *Cancellier, supra.* In both of these cases, plaintiff's entitlement to the position is recognized but placement in the position is deferred or excused, with front pay being added as a form of interim or substituted compensation. In such case, the salary for the position in question sets the standard for the proper amount of front pay. In *O'Donnell v. Georgia Osteopathic Hos-*

---

**10.** In some factual contexts the training one receives for future promotional opportunities could be a significant attribute of the position.

However, the evidence did not show a promotional hierarchy within Defendant's local sales department.

*pital, Inc.,* 748 F.2d 1543 (11th Cir.1984), the Court of Appeals specifically held that front pay is an available remedy under the Age Discrimination in Employment Act.

 The instant case, however, does not involve a situation where otherwise appropriate immediate reinstatement is contra-indicated by considerations of fairness to an incumbent employee or to the Plaintiff himself. Instead, here there is no viable claim for reinstatement of the sort requested by Plaintiff. In other words, even if the account were presently not assigned to anyone, it would be improper to direct that the account be reassigned to Plaintiff. To call reassignment of the McCann-Erickson account "reinstatement" is simply a misnomer. Accordingly, the court declines to enter an award of front pay based on a claim of entitlement to the McCann-Erickson account.

*Prejudgment Interest on the Backpay Award*

 Prejudgment interest is awardable in the discretion of the court when such award is necessary to make Plaintiff whole. *See O'Donnell, supra* at 1552; *Merriweather v. Hercules, Inc.,* 631 F.2d 1161, 1168 (5th Cir.1980). The court, in its discretion, determines that no prejudgment interest award is appropriate in this case.

*Adjustment of Pension Benefits*

 Plaintiff's pension arrangements with Defendant call for Defendant to contribute certain amounts to a pension fund on a yearly basis based on employees' earnings. When an employee retires, the amount he is entitled to draw is determined by a formula which is applied to his five highest consecutive years of earnings.

Defendant correctly points out that the court cannot at this point determine what Plaintiff's pension benefit will be. This is because the date of Mr. Ingram's retirement is presently unknown. However, the court does direct that Defendant cause the pension records to be corrected so as to reflect the additional $16,500 of income awarded by the jury to Mr. Ingram. This additional income shall be treated as income for the period from July 1, 1982 through December 31, 1984, evenly distributed throughout that period of time.

*Award of Attorney's Fees*

 As the prevailing party, Plaintiff is entitled to an award of reasonable attorney's fees and expenses. Pursuant to local rule of this court, judgment will be entered at this time and consideration of the proper amount of attorney's fees and expenses is DEFERRED.

The Clerk is hereby DIRECTED to enter final judgment in favor of the Plaintiff in the sum of $16,500.

The court further ORDERS and DIRECTS Defendant to properly mark its pension records so as to reflect additional earnings of $16,500 for the Plaintiff for the period from July 1, 1982 through December 31, 1984, said amounts to be spread evenly over this period of time.