Arthur **CARLSON**, Plaintiff,

v.

**WPLG/TV–10, POST–NEWSWEEK STATIONS OF FLORIDA,** Defendant.

No. 94–0228–CIV.

United States District Court, S.D. Florida.

April 25, 1996.

Order Amending Decision in Part Aug. 31, 1996.

William Robert Amlong, Amlong & Amlong PA, Fort Lauderdale, FL, Thomas Emerson Scott, Jr., Davis Scott Weber & Edwards, Miami, FL, for Arthur Carlson.

Mark Howard Richard, Coral Gables, FL, John Moore Brumbaugh, Scott Dozier Sheftall, Richman Greer Weil Brumbaugh Mirabito & Christensen PA, Miami, FL, Tamir W. Rosenblum, Cohen, Weiss and Simon, New York City, for WPLG/TV 10 Post-Newsweek Stations of Florida, Inc.

### CORRECTED ORDER ON MOTIONS FOR SUMMARY JUDGMENT

UNGARO-BENAGES, District Judge.

THIS CAUSE is before the Court upon Defendant WPLG/TV–10's Motion for Summary Judgment filed July 17, 1995, Plaintiff Arthur Carlson's sealed Motion for Partial Summary Judgment filed on September 15, 1995, Plaintiff's Motion to Alter or Amend Order on Motions for Summary Judgment filed February 22, 1996, and Defendant's Rule 59(e) Motion to Alter or Amend Judgment filed February 26, 1996.

In his Second Amended Complaint, Plaintiff Arthur Carlson ("Carlson") claims Defendant WPLG/TV–10 ("WPLG") violated the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621, as amended, and the Florida Civil Rights Act of 1992, Florida Statutes § 760.01, *et seq.*, as amended, when it decided not to renew his contract as news anchor and then constructively discharged him due to his age. Carlson also claims that WPLG breached a collective bargaining agreement between WPLG and AFTRA when it refused to renew his contract and that WPLG defamed him in an interview given by Tom Doerr, news director, to the Sun Sentinel. Defendant moves for summary judgment on all of Plaintiff's claims against it on the grounds that it permissibly relied on non-age-related objective criteria in making the decision to remove Carlson from his position as anchor, that Plaintiff quit and was not constructively discharged, and that the statements made by Defendant were not defamatory. Plaintiff opposes Defendant's motion in its entirety and cross-moves for summary judgment on Counts I through IV, claiming that he has presented sufficient direct and circumstantial evidence to establish that he was demoted and then constructively discharged due to unlawful age discrimination.

The Court ruled in favor of Defendant on Counts V and VI and in favor of Plaintiff on

Counts I through IV in its Order on Motions for Summary Judgment dated February 7, 1996. Plaintiff filed a motion to alter or amend based on the Court's failure to award Plaintiff intangible and/or emotional distress damages under F.S. § 760.11 and prejudgment interest on any back pay awarded to Plaintiff. Defendant also filed a motion to alter or amend based primarily on the Court's vagueness in handling the constructive discharge issue and Defendant's contention that the Court failed properly to apply the appropriate legal standards to the facts in this case.

THE COURT has considered the Motions, responses, and the pertinent portions of the record, and being otherwise fully advised in the premises, it is hereby

ORDERED AND ADJUDGED that Defendant WPLG's Motion for Summary Judgment be denied with regards to Counts I through IV, Defendant's Motion for Summary Judgment should be granted for Defendant regarding Counts V and VI, and Plaintiff's Motion for Partial Summary Judgment should be granted with regards to Counts I and III and denied with regards to Counts II and IV for the reasons set forth below.

*FACTS*

Arthur Carlson was terminated from his employment with WPLG/TV–10, a Miami, Florida television broadcaster, on August 13, 1993. Carlson was forty-four (44) at the time and had worked for WPLG in some capacity for the last sixteen years. The last positions Carlson held were morning and mid-day anchor, in addition to medical reporter. Carlson had held these three positions for the last 8 years, and was being paid $210,000 for the first 18 months of his most recent personal services contract, $145,000 for the second year, and $154,300 for the last year. Carlson had received praise from the news community, particularly for his medical reporting, and had never received an unsatisfactory performance evaluation.

Between 1991 and 1993, WPLG used the services of the McNulty Research Group ("McNulty") to do focus group studies and surveys for the station. WPLG would essentially dictate the areas and, to a lesser extent, the questions, for McNulty to research.

Over the years, McNulty reported that the viewer trend was toward younger and more vibrant news reporters and anchors, marking a drastic change in the market perception. The station gave great credence to these findings and sought to implement them.

In 1992 and 1993, both then-news director Tom Doerr ("Doerr") and the station image consultant began making comments to the effect that Carlson needed to look younger. Carlson proceeded to darken his hair and mustache. However, in January of 1993, the image consultant wrote a letter to Doerr stating that Carlson still dressed and looked much older than his age and ending with the comment "off with the old and on with the new."

In the spring of 1993, Carlson learned from Doerr that many changes were to take place at the station later that year. Doerr told Carlson that he was to be removed from his positions as morning and mid-day anchor and was to concentrate on medical reporting full time. Doerr knew that Carlson would consider such a change a demotion, as he had been anchoring for many years. The stated reason for this change was that medical reporting was Carlson's strength and that the station wanted to make sure it had a strong foothold in that area.

Carlson was also to receive an almost 45% decrease in his salary, down to around $90,-000 per year. WPLG's collective bargaining agreement with the American Federation of Television and Radio Artists ("AFTRA"), which covered Carlson, expired on December 3, 1992. At the time of Doerr's announcement to Carlson, Carlson and WPLG were in the midst of negotiating a new personal services contract, independent from any collective bargaining agreement involving AFTRA. WPLG continued to pay Carlson at the level of his previous salary while they negotiated.

In July of 1993, while negotiations ostensibly continued, Carlson took an "emergency leave" due to serious health problems in his wife's family in Albuquerque, New Mexico. However, Carlson then flew to Montana to interview for a position at a television station there and apparently placed a bid on a house there as well. Upon Carlson's return, Doerr

stated to Carlson that he had heard of Carlson's new job offer—though he did not yet know the new job was the real purpose of Carlson's "emergency leave"—and that, as far as the station was concerned, Carlson had quit. Doerr noted later that, if Carlson had not quit, he would have been fired immediately once the station found out that he had lied about his "emergency leave."

Doerr was interviewed by the Sun Sentinel regarding Carlson's departure. Doerr made statements to the effect that the station had demoted Carlson to medical reporting because that was his strength, and Carlson had decided to leave rather than accept the demotion. Doerr also commented generally that veterans were not as valuable in the news field as they used to be.

## LEGAL STANDARD

The procedure for disposition of a summary judgment motion is well established. Summary judgment is authorized only when:

the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is *no genuine issue as to any material fact* and that the moving party is entitled to a judgment as a matter of law. (emphasis added)

Fed.R.Civ.P. 56; *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Everett v. Napper,* 833 F.2d 1507, 1510 (11th Cir.1987). The party moving for summary judgment has the burden of meeting this exacting standard. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). In applying this standard, the *Adickes* Court explained that, when assessing whether the movant has met this burden, the court should view the evidence and all factual inferences therefrom in the light most favorable to the party opposing the motion. All reasonable doubts about the facts should be resolved in favor of the non-movant. *Adickes,* 398 U.S. at 157, 90 S.Ct. at 1608.

The party opposing the motion may not simply rest upon mere allegations or denials of the pleadings. After the moving party has met its burden of coming forward with proof of the absence of any genuine issue of material fact, the non-moving party must make a

sufficient showing to establish the existence of an essential element to that party's case, and on which that party will bear the burden of proof at trial. *Celotex,* 477 U.S. at 325, 106 S.Ct. at 2553; *Barfield v. Brierton,* 883 F.2d 923, 933 (11th Cir.1989).

If the record presents factual issues which are material to the outcome of the case, the Court must not decide them; it must deny the motion and proceed to trial. *Environmental Defense Fund v. Marsh,* 651 F.2d 983, 991 (5th Cir.1981). Summary judgment may be inappropriate even where the parties agree on the basic material facts, but disagree about the inferences that should be drawn from these facts. *Lighting Fixture & Elec. Supply Co. v. Continental Ins. Co.,* 420 F.2d 1211, 1213 (5th Cir.1969). If reasonable minds might differ on the inferences arising from undisputed material facts then the Court should deny summary judgment, as a genuine dispute exists. *Impossible Electronic Techniques, Inc. v. Wackenhut Protective Systems, Inc.,* 669 F.2d 1026, 1031 (5th Cir. 1982). *See also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) ("[T]he dispute about a material fact is 'genuine,' . . . if the evidence is such that a reasonable jury could return a verdict for the non-moving party").

## LEGAL ANALYSIS

### The Age Discrimination in Employment Act

#### I. The Parties' Burdens

In order to prevail, Plaintiff must establish a prima facie case of discrimination by a preponderance of the evidence. The prima facie case, once established, leads to a rebuttable presumption that the employer unlawfully discriminated against the employee. *Texas Dept. of Com. Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). The employer then has the burden of producing—but not proving—an explanation to rebut the prima facie case—that the adverse employment action was taken for legitimate, nondiscriminatory reasons. *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1094; *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 507, 113 S.Ct. 2742, 2747, 125 L.Ed.2d 407 (1993)

(" '[T]he defendant must clearly set forth, through the introduction of admissible evidence,' reasons for its actions which, *if believed by the trier of fact,* would support a finding that unlawful discrimination was not the cause of the employment action."). Normally, the defendant's burden is relatively light, *see Perryman v. Johnson Products Co.,* 698 F.2d 1138 (11th Cir.1983), but the defendant must still produce clear and reasonably specific evidence of an asserted legitimate reason for its employment decision. *Burdine,* 450 U.S. at 257, 101 S.Ct. at 1096; *IMPACT v. Firestone,* 893 F.2d 1189 (11th Cir.1990); *Lee v. Russell County Board of Education,* 684 F.2d 769 (11th Cir.1982). Further, the burden on rebuttal is heavier when the employee has established the prima facie case by direct evidence. *Buckley v. Hospital Corp. of America, Inc.,* 758 F.2d 1525, 1529 (11th Cir.1985); *Lee,* 684 F.2d at 774.

If the defendant can satisfy the burden of production that is placed upon it,

> '[t]he presumption raised by the prima facie case is rebutted.' [citations omitted] The plaintiff then has 'the full and fair opportunity to demonstrate,' through presentation of his own case and through cross-examination of the defendant's witnesses, 'that the proffered reason was not the true reason for the employment decision'

*St. Mary's,* 509 U.S. at 507–08, 113 S.Ct. at 2747; *Burdine,* 450 U.S. at 255–56, 101 S.Ct. at 1094–95. Plaintiff's evidence must be "concrete evidence in the form of specific facts which show the defendant's proffered reason is mere pretext." *Earley v. Champion International Corp.,* 907 F.2d 1077, 1081 (11th Cir.1990). In the context of a summary judgment motion wherein the defendant has offered a nondiscriminatory reason for the adverse employment decision, the plaintiff has the burden of coming forward with admissible evidence from which a reasonable juror could conclude that unlawful discrimination motivated the employer's actions. *See generally Walker v. NationsBank of Fla., N.A.,* 53 F.3d 1548 (11th Cir.1995); *Corbin v. Southland Intern. Trucks,* 25 F.3d 1545 (11th Cir.1994); *Mulhall v. Advance Sec., Inc.,* 19 F.3d 586 (11th Cir.1994).

## II. Prima Facie Case

Plaintiff may establish a prima facie case of age discrimination in three ways: (1) by offering direct evidence of discriminatory intent; (2) by satisfying the four prong test set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); or (3) by establishing a pattern of discrimination through statistical proof *Buckley,* 758 F.2d at 1529; *Trumbull v. Health Care & Ret. Corp. Of America,* 756 F.Supp. 532, 536–37 (M.D.Fla.1991). Plaintiff attempts to prove his case both by presenting direct evidence and by meeting the *McDonnell Douglas* test.

### A. Direct Evidence

Evidence that, if taken as true, would prove the existence of age discrimination without inference or presumption is direct evidence of age discrimination. *Carter v. City of Miami,* 870 F.2d 578, 581–82 (11th Cir.1989) (citing *Castle v. Sangamo Weston, Inc.,* 837 F.2d 1550, 1558 n. 13 (11th Cir. 1988)). If the plaintiff can produce such evidence, the employer must then rebut this evidence by showing that it would have made the same employment decision had the discriminatory intent not existed. *See Young v. General Foods Corp.,* 840 F.2d 825, 828 (11th Cir.1988); *Buckley v. Hospital Corp. of America,* 758 F.2d 1525, 1529–30 (11th Cir. 1985). Generally, plaintiffs tend to rely on remarks made to them or others by their employers as direct evidence of discriminatory intent.

It is well-settled in the Eleventh Circuit that not all comments relating to a plaintiff's age constitute direct evidence of age discrimination by an employer. *Carter,* 870 F.2d at 582, n. 10 ("[R]emarks merely referring to characteristics associated with increasing age, or facially neutral comments from which a plaintiff has inferred discriminatory intent, are not directly probative of discrimination.") (citing *Young v. General Foods Corp.,* 840 F.2d at 829). *See also Alphin v. Sears, Roebuck & Co.,* 940 F.2d 1497 (11th Cir.1991) (comment that employee had been around

too long and was too old was direct evidence of age discrimination); *Barnes v. Southwest Forest Industries, Inc.,* 814 F.2d 607, 610–11 (11th Cir.1987) (comment that employer did not think guard could pass a physical at his age was not direct evidence of discriminatory intent); *Lindsey v. American Cast Iron Pipe Co.,* 772 F.2d 799, 801 (11th Cir.1985) (statement that plaintiff was not considered for upcoming position because company would be looking for younger person was direct evidence); *Williams v. General Motors Corp.,* .656 F.2d 120, 129 (5th Cir.1981) (note on paper saying "too old- lay off" was direct evidence); *Simmons v. McGuffey Nursing Home, Inc.,* 619 F.2d 369, 371 (5th Cir.1980) (remark that board wanted younger man was not direct evidence). For a comment to demonstrate discriminatory intent, it must be blatant, *Trumbull,* 756 F.Supp. at 537 (comments must be blatant regarding person's age to constitute direct evidence under *Young* ), and one "whose intent could be nothing other than to discriminate on the basis of age ..." *Carter,* 870 F.2d at 582.

█ Here, Plaintiff presents two remarks admittedly made by Doerr to a newspaper reporter from the Sun Sentinel, in the context of that reporter writing an article about Plaintiff as direct evidence of age discrimination. First, Plaintiff alleges that Doerr told the reporter that Plaintiff's demotion from anchorman to medical reporter was because medical reporting was his strength. Second, Doerr apparently commented that veterans—which category Plaintiff inferred to include himself—had less value in the news business than they used to have.

The Court finds that, although Plaintiff interpreted these remarks as meaning Plaintiff was considered too old to perform his anchorman duties, neither of the comments was blatant enough to constitute direct evidence of age discrimination. It may be true that Plaintiff was embarrassed by the fact that his demotion was made known to others.[1] However, Doerr apparently made an effort to phrase the information in a light favorable to Plaintiff,

talking in terms of Plaintiff's strengths, not weaknesses. As to the comment about veterans being less valuable, the Court finds the comment to be general in nature and not personalized to Plaintiff's value in the news field. Even were the Court to view the comment as personal to Plaintiff, the Court remains unconvinced that the comment is direct evidence of age discrimination, as it only tangentially refers to Plaintiff's age. It is entirely possible that Doerr was referring to individuals *under* the age of 40 who had been in the news business since a young age and could thus also be considered "veterans." Because the statement by itself does not indicate Doerr's intended meaning of the word "veteran," the Court finds that this second comment is not blatant enough, without more, to constitute direct evidence of age discrimination. Therefore, the Court finds that Plaintiff has failed to produce sufficient direct evidence of discriminatory intent sufficient to make out a prima facie case and accordingly turns to the requirements of the *McDonnell Douglas* test.

### B. The *McDonnell Douglas* test

Plaintiff may establish a prima facie case of discrimination based on age by meeting the following four-prong test set forth in *McDonnell Douglas,* as modified to fit age discrimination cases by both *Earley v. Champion International Corp.,* 907 F.2d 1077, 1081 (11th Cir.1990) and *Carter,* 870 F.2d at 582:

(1) Plaintiff is a member of the protected group, in this case, a person between the ages of 40 and 70;

(2) an adverse employment action was taken against Plaintiff, such as demotion or discharge;

(3) Plaintiff was replaced by a person outside the protected group; and

(4) Plaintiff was qualified for the position from which he was demoted or discharged. There appears to be no question regarding the first prong: Plaintiff Carlson was clearly

---

1. The question of whether the comment was embarrassing enough to be slanderous is discussed, *infra,* in the Court's section on defamation.

a member of the protected age group at the time the adverse employment action by Defendant took place.[2] Furthermore, it appears that both parties agree the move from morning and mid-day anchorman to medical reporter was indeed a demotion.[3] Therefore, the Court focuses its attention on the last two prongs of the test.

Plaintiff Carlson argues that he satisfies the third prong because he was replaced by a person outside of the protected age group. Defendant, on the other hand, asserts that "several" people were given the duties formerly assigned to Plaintiff. However, Defendant fails to name these people, making it difficult for Plaintiff to allege that all or some of them were not part of the protected group. Despite the attempted roadblock, the Court finds that Plaintiff has indeed adduced facts sufficient to satisfy the third prong of the *McDonnell Douglas* test.

In his Statement of Material Facts in Opposition to Defendant's Motion for Summary Judgment, Plaintiff Carlson points out that Doerr's testimony showed that Kristi Krueger has taken over the role of medical reporter from Defendant, and that the position is not full-time as Doerr led Plaintiff Carlson to believe. Furthermore, Doug Dunbar, a radio disc jockey inexperienced at television reporting, was hired by Defendant to fill the morning anchor position, and Frederica Whitfield eventually took over the mid-day anchor position. All three of these people are outside of the protected age group.[4]

The fact that Plaintiff cannot identify a single individual who replaced him in all his various duties, does not prevent Plaintiff from establishing a prima facie case. The Eleventh Circuit has "declined to hold that a

plaintiff's inability to show that he was replaced by someone under forty is an absolute bar to the establishment of a prima facie case." *Carter*, 870 F.2d at 583. *See also Castle v. Sangamo Weston, Inc.*, 837 F.2d 1550 (11th Cir.1988); *Goldstein v. Manhattan Industries, Inc.*, 758 F.2d 1435 (11th Cir.), *cert. denied*, 474 U.S. 1005, 106 S.Ct. 525, 88 L.Ed.2d 457 (1985); *Pace v. Southern Railway System*, 701 F.2d 1383 (11th Cir.), *cert. denied*, 464 U.S. 1018, 104 S.Ct. 549, 78 L.Ed.2d 724 (1983); *McCorstin v. United States Steel Corp.*, 621 F.2d 749 (5th Cir. 1980).[5] Furthermore, other circuits have been lenient concerning the satisfaction of this requirement. *See e.g., Carden v. Westinghouse Electric Corp.*, 850 F.2d 996, 1000 (3d Cir.1988); *Furr v. AT & T Technologies, Inc.*, 824 F.2d 1537, 1542 (10th Cir.1987); *Diaz v. AT & T*, 752 F.2d 1356, 1359–60 (9th Cir.1985); *Loeb v. Textron, Inc.*, 600 F.2d 1003, 1012–13 (1st Cir.1979). Finally, the Eleventh Circuit has held that the ADEA cannot be applied in a mechanical fashion because age discrimination is more subtle than other forms of discrimination. *Castle*, 837 F.2d at 1559; *McCorstin*, 621 F.2d at 754.[6] Pursuant to the holding in *Castle*, this Court finds that the evidence taken in the light most favorable to Defendant demonstrates that Plaintiff has satisfied the third prong of the *McDonnell Douglas* test.

The remaining prong of the test addresses Plaintiff's qualification for the position from which he was demoted or discharged. Although Plaintiff may use past performance review data to establish that he was indeed qualified for the position of anchor, the Court finds that such review data is almost superfluous in light of Plaintiff's obvious qualification for the job he held for over 8 years.

---

2. Plaintiff Carlson was 44, and the protected age group is ages 40 through 70.

3. Plaintiff further contends that this demotion was a constructive discharge. The Court discusses the issue *infra*, at 1003–04. For the purposes of meeting the second prong of the *McDonnell Douglas* test, it is irrelevant whether Plaintiff was demoted or discharged; either action is an adverse employment action.

4. Ms. Krueger was then 30 years old. Mr. Dunbar was 29, and Ms. Whitfield was in her late twenties or early thirties.

5. All decisions of the former Fifth Circuit handed down prior to September 30, 1981, constitute binding precedent on this Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981).

6. Defendant does not attempt to argue that Plaintiff's demotion or constructive discharge was a reduction in force, which would make the issue of his replacement irrelevant. *McCuen v. Home Ins. Co.*, 633 F.2d 1150, 1151 (5th Cir.1981).

*Elrod v. Sears, Roebuck and Co.,* 939 F.2d 1466 (11th Cir.1991); *Baker v. Sears, Roebuck and Co,* 903 F.2d 1515 (11th Cir.1990); *Stanfield v. Answering Service,* 867 F.2d 1290 (11th Cir.1989). *See also Bell v. Desoto Memorial Hospital, Inc.,* 842 F.Supp. 494, 497 (M.D.Fla.1994) (plaintiff may satisfy prima facie case requirement by presenting evidence that performance in position from which he was demoted or discharged continued without complaint for several years.) Additionally, statements of his co-workers and various superiors in their depositions attest to the fact that Plaintiff was qualified for his position. Furthermore, Defendant does not even attempt to argue that Plaintiff was unqualified for the position of daytime anchor/medical reporter. Therefore, the Court has no difficulty in finding that Plaintiff has met the fourth and last prong of the *McDonnell Douglas* test and has therefore established a prima facie case of age discrimination which Defendant must rebut.

## II. Rebuttal

Since Plaintiff has satisfied his burden of establishing a prima facie case of one or more types of discrimination, Defendant now has the burden of producing evidence of a legitimate nondiscriminatory reason for its adverse employment action. This burden is not a heavy one, as Defendant need only produce, and not prove, a legitimate nondiscriminatory reason. *Walker v. NationsBank of Fla., N.A.,* 53 F.3d 1548, 1556 (11th Cir. 1995); *Perryman v. Johnson Products Co., Inc.,* 698 F.2d 1138, 1142 (11th Cir.1983). However, Defendant must be clear and specific with regards to the evidence which it produces. *Burdine,* 450 U.S. at 257, 101

S.Ct. at 1096; *IMPACT v. Firestone,* 893 F.2d 1189 (11th Cir.1990).

In this case, Defendant does not appear to offer a clear or specific rebuttal in its summary judgment papers. In fact, the only portions of Defendant's arguments that could reasonably be considered as rebuttal are a statement in Defendant's Statement of Undisputed Facts, at 5 ¶ 36, that "[I]n the later spring of 1993; after doing marketer research, the management of WPLG/TV 10 determined that Carlson would be removed from his position as morning and mid-day anchor," a statement in Section I.A of Defendant's Summary Judgment Motion that "[b]ased on management's evaluation and the research of outside consultants, management determined Carlson should focus on his medical reporting," and Section I.C, which discusses the doctrine of after-acquired evidence and Plaintiff's "emergency leave" explanation.[7] Although Defendant has not met the clear and specific burden of *Burdine,* the Court proceeds to consider whether such evidence, viewed in the light most favorable to Defendant, suffices to rebut the presumption that Plaintiff has shown discriminatory action on Defendant's part based on Plaintiff's age.

### A. Outside Consultant Research

In its Motion for Summary Judgment, Defendant barely asserts this outside research as a legitimate nondiscriminatory reason for its adverse employment action, confining its argument to the two sentences and the one section referred to above. Plaintiff presents a more thorough discussion of the research Defendant refers to and why it does not qualify as a legitimate nondiscriminatory rea-

---

7. The Court notes that Defendant did allude several times to other considerations which it claims led to Plaintiff's demotion, i.e., that Carlson's morning and mid-day shows were not the top news broadcasts in their timeslots and that Defendant felt it was losing ground with regards to medical reporting. *See* Defendant's Reply to Plaintiff's Opposition to Defendant's Motion for Summary Judgment. However, viewing the evidence in the light most favorable to Defendant, the Court concluded that Defendant demoted Plaintiff due to its reliance on the McNulty reports and the research which led to those reports. Indeed, Defendant insists repeatedly in various depositions that it did not act on management's subjective evaluation of Plaintiff's worth as an anchor, as evidenced by memoranda from the March 30, 1993 meeting, because it did not want to appear to be acting solely on its own discriminatory conclusions. *See* Doerr deposition, at 38–39, 70. Defendant cannot reap the benefit of these statements and then argue that the McNulty research was *not* the main reason for demoting or terminating Plaintiff. Therefore, the Court rejects these "other" considerations as legitimate nondiscriminatory reasons on which Defendant acted.

son in its summary judgment pleadings. However, Defendant does appear to rely on this research as its legitimate nondiscriminatory reason in its various depositions. Additionally, Fed.R.Civ.P. 56(c) states that the Court may consider the pleadings, depositions, answers to interrogatories, and admissions on file, when considering a summary judgment motion. Therefore, the Court will address the issue of Defendant's reliance on outside consultant research in determining what action to take with respect to Plaintiff's job.

■ In various depositions taken by Plaintiff, Defendant's employees cite "the McNulty reports"[8] as the principal reason for their decision regarding Plaintiff's position at anchor. *See generally* depositions of Tom Doerr, Oscar Welch; and John Garwood. Basically, the McNulty reports were focus group surveys done regarding the image and dynamics of the news reporters at WPLG. These surveys were plainly done to ascertain viewer's perceptions about the age of the news reporters; Defendant cannot realistically argue differently in light of the questions presented to the focus groups in the surveys. *See e.g.,* Plaintiff's Statement of Material Facts in Opposition to Defendant's Motion for Summary Judgment, at 15–16. Although phrased in terms of the "image" and "dynamics" of the reporters, the surveys were nothing more than thinly-veiled attempts to determine if the viewers would react more favorably to a younger group of reporters. Accordingly, the Court finds that Defendant has not produced evidence of an actual legitimate nondiscriminatory reason for the adverse employment action taken against Plaintiff; in that reliance on the McNulty surveys constitutes reliance on the impermissible factor of age in making employment decisions. In addition, Defendant's attempt to classify such reliance as objectively based fails because Defendant dictated the areas—and arguably some of the questions—that were to be considered in the McNulty surveys, and those areas and questions indirectly referred to impermissible age considerations. Therefore, the Court finds that,

based on its reliance on the McNulty reports, Defendant has not met its light burden of producing a legitimate nondiscriminatory reason for its employment actions.

### B. *After-acquired Evidence of Wrongdoing*

■ Because the Court finds that Defendant's reliance on outside consultant research does not satisfy Defendant's burden, this Court can only surmise that Defendant submits that its legitimate nondiscriminatory reason for demoting or constructively discharging Plaintiff is that it would have discharged Plaintiff anyway once it acquired evidence that he lied about his "emergency leave." *McKennon v. Nashville Banner Publishing Co.,* 513 U.S. 352, 115 S.Ct. 879, 130 L.Ed.2d 852 (1995) is exactly on point on this issue.

In *McKennon,* an employee alleged that she had been discharged due to impermissible age considerations. During discovery of the action, she admitted that she had copied confidential documents relating to the company's financial position—which directly contravened company policy—for her own "insurance" and "protection." The Banner claimed that, if it had known of her misconduct, it would have fired her immediately. The U.S. Supreme Court held that after-acquired evidence of wrongdoing did not act as a complete bar to relief under the ADEA. *Id.,* at ——, 115 S.Ct. at 883. The Court reached this decision by looking to the purposes of the ADEA and concluding that barring any recovery would not serve these purposes, particularly the purpose of deterrence of discrimination in the workplace. The Court also noted that, because the evidence of wrongdoing was not known to the employer at the time of the discharge, it could not have motivated the employer and thus could not constitute the nondiscriminatory reason for the adverse employment action. *Id.,* at ——, 115 S.Ct. at 885. Therefore, the Court ultimately held that after-acquired evidence could only affect the amount of damages

---

8. *See* Exhibit no. 13, McNulty Research, Inc., a Focus Group Perspective, February 1991; Exhibit no. 14, McNulty Research, Inc., a Focus Group Perspective, June 1992; Exhibit no. 15, McNulty Research, Inc., a Focus Group Perspective, April 1993.

incurred by the employee: neither frontpay nor reinstatement should be allowed, and the evidence should operate to limit the back pay from the date of the adverse employment action to the date the evidence of wrongdoing was discovered. *Id.*, at –––––––, 115 S.Ct. at 886–87.

In the Court's opinion, Defendant's argument regarding the after-acquired evidence of Plaintiff's lying about his leave does not constitute adequate rebuttal under the *McDonnell Douglas* test in light of the *McKennon* standard. At most, it serves only to limit the amount and type of damages which may be awarded to Plaintiff. The Court finds that Defendant has not carried its burden of producing a legitimate nondiscriminatory reason for its decision to remove Plaintiff from his position as anchorman and, for that reason, does not address the issue of whether Plaintiff can prove that the reason given was pretextual. Therefore, the Court finds in favor of Plaintiff on Count I of the Second Amended Complaint.

### Constructive Discharge under the ADEA

Plaintiff alleges that Defendant constructively discharged him by telling him that, due to Plaintiff's reported new job offer, Defendant assumed he had quit. Accordingly, Plaintiff requests both back pay and liquidated damages. Defendant, on the other hand, claims that, by looking for a new job and receiving another job offer, Plaintiff voluntarily resigned his position. Thus, Defendant claims it cannot be held liable for either back pay or liquidated damages because Plaintiff was not constructively discharged.

*Young v. Southwestern Savings and Loan Association*, 509 F.2d 140 (5th Cir.1975) set forth a plaintiff's burden of proving a prima facie case for constructive discharge as follows:

> The general rule is that if the employer deliberately makes an employee's working condition so intolerable that the employee is forced into involuntary resignation, then the employer has encompassed a constructive discharge and is as liable for any illegal conduct involved therein as if it had formally discharged the aggrieved employee.

*Id.*, at 144. *See also Calcote v. Texas Educ. Foundation, Inc.*, 578 F.2d 95 (5th Cir.1978). *Bourque v. Powell Elec. Mfg. Co.*, 617 F.2d 61 (5th Cir.1980) further refined the definition of the prima facie case to comport more with the "realities of modem employment.", There, the Fifth Circuit held that it is unnecessary for the imposition of intolerable working conditions to be designed *specifically* to force the employee to resign, thus focusing on the conditions imposed, as opposed to the employer's actual intent:

> To find constructive discharge we believe that 'the trier of fact must be satisfied that the ... working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.'

*Id.*, at 65, citing *Alicea Rosado v. Garcia Santiago*, 562 F.2d 114, 119 (1st Cir.1977). A plaintiff need not prove a defendant specifically intended to force him to resign in order to prevail on his constructive discharge claim. *Jurgens v. EEOC*, 903 F.2d 386 (5th Cir. 1990). The question of whether a constructive discharge occurred depends on whether the employer, through its action, created working conditions that were intolerable to the employee. *Hargray v. City of Hallandale*, 57 F.3d 1560 (11th Cir.1995); *Steele v. Offshore Shipbuilding, Inc.*, 867 F.2d 1311 (11th Cir.1989); *Huddleston v. Roger Dean Chevrolet, Inc.*, 845 F.2d 900 (11th Cir.1988). In other words, Plaintiff must show that his working conditions were so difficult that a reasonable person would have felt compelled to resign. *Hill v. Winn–Dixie Stores, Inc.*, 934 F.2d 1518 (11th Cir.1991); *Wardwell v. School Bd. of Palm Beach County, Fla.*, 786 F.2d 1554 (11th Cir.1986); *Bourque v. Powell Elec. Mfg. Co.*, 617 F.2d 61 (5th Cir.1980).

■ Plaintiff asserts that both Defendant's demotion of Plaintiff and its statement that Plaintiff voluntarily quit his job left him no choice but to leave WPLG's employ. However, Defendant argues that Plaintiff has not shown any intent by Defendant to force Plaintiff to quit his job. Although Plaintiff adamantly asserts that any person in his position—an anchor and medical reporter demoted to only medical reporter at little more than half his original pay—would have felt

forced to resign, the imposition of the reasonable person standard as detailed above necessarily creates a genuine issue of material fact which must be put before a jury. *Castle; Wardwell; Goldstein v. Manhattan Industries, Inc.,* 758 F.2d 1435, 1443 (11th Cir.), *cert. denied,* 474 U.S. 1005, 106 S.Ct. 525, 88 L.Ed.2d 457 (1985); *Buckley v. Hospital Corp. of America, Inc.,* 758 F.2d 1525 (11th Cir.1985); *Bourque.* Therefore, the Court finds that it must deny summary judgment for both parties as to Count II regarding constructive discharge under the ADEA.

### The Florida Civil Rights Act of 1992

Both federal and state law hold that a prima facie case can be established under the Florida Civil Rights Act of 1992 ("FCRA") in the same manner as under the ADEA. *Castle v. Sangamo Weston, Inc.,* 837 F.2d 1550 (11th Cir.1988) (same burdens which apply in *McDonnell Douglas test* apply to constructive discharge); *Trumbull,* 756 F.Supp. at 536 (prima facie case under FCRA can be established in same way as under ADEA); *Morrow v. Duval County School Board,* 514 So.2d 1086, 1087 (Fla.1987) (Florida's legislation on age discrimination is similar to policy behind federal legislation); *Florida Dept. of Com. Affairs v. Bryant,* 586 So.2d 1205, 1209 (Fla. 1st DCA 1991) (Florida's Human Rights Act of 1977 patterned after Title VII, 42 U.S.C. § 2000e–2, thereby making federal law regarding Title VII applicable). Therefore, the Court finds in favor of Plaintiff as to Count III of the Second Amended Complaint based on the above analysis under the ADEA. However, as stated above, a genuine issue of material fact remains as to whether plaintiff was constructively discharged by Defendant. Therefore, the Court denies both Plaintiff's and Defendant's motions for summary judgment with regards to Count IV of the Second Amended Complaint.

### Breach of Contract

 Count V alleges a breach of contract, specifically a collective bargaining agreement between AFTRA, of which Plaintiff was a member, and WPLG. Plaintiff alleges that Defendant breached its personal services contract with Plaintiff when it terminated him. It is true that, when an employee continues working under a contract after its expiration, a presumption does arise that the contract is renewed. *Consolidated Bearings Co. v. Ehret–Krohn Corp.,* 913 F.2d 1224 (7th Cir.1990). However, when there is evidence that the parties were in the process of negotiating a new contract, this evidence acts to rebut the presumption by negating the inference that either party believes the previous contract had been renewed. *Id.,* at 1230. Both Plaintiff and Defendant acknowledge that they were in the midst of negotiating a new personal services contract when Plaintiff was terminated. Therefore, pursuant to *Consolidated,* there can be no presumption that the previous contract continued to be in force.

Without an individual personal services contract on which to base his claim, Plaintiff can only allege that Defendant violated the terms of the collective bargaining agreement between AFTRA and, WPLG. Yet, Defendant asserts, and Plaintiff himself acknowledges, that the collective bargaining agreement had expired at the time that Defendant allegedly breached Plaintiff's individual contract. Accordingly, Plaintiff has no contract or agreement on which to base a breach of contract claim and therefore this Court finds in favor of Defendant with regards to Count V.[9]

### Defamation

 Summary judgment is an appropriate vehicle for disposition of a defamation claim. *Southard v. Forbes, Inc.,* 588 F.2d

9. As an aside, the Court rejects Defendant's argument that Section 301, the Labor Management Relations Act of 1947, 29 U.S.C. § 185, would govern in this situation because Plaintiff's claim is founded directly on rights created by a collective bargaining agreement and substantially dependent on analysis of such agreement. *Caterpillar, Inc. v. Williams,* 482 U.S. 386, 107 S.Ct. 2425, 96 L.Ed.2d 318 (1987), specifically held that if an employee alleges that his employer breached his *individual*—i.e., personal services—contract, Section 301 does not apply, even if the employee could have brought a § 301 argument based on the collective bargaining agreement. *Id.,* at 394, 107 S.Ct. at 2431. The Court finds that Plaintiff, though unsuccessful in his breach of contract claim, intended to bring suit based on his individual, personal services contract, and not the collective bargaining agreement, which both parties acknowledge had expired.

140, 145–46 (5th Cir.1979). Therefore, the Court addresses this issue on the merits. Under Florida law, the elements of defamation are as follows: Defendant (1) made a statement, (2) that was false, (3) to a third party, i.e., Defendant "published the statement," and (4) Plaintiff suffered damages as a result. *Shaw v. RJ Reynolds Tobacco Co.,* 818 F.Supp. 1539 (M.D.Fla.1993), *affirmed,* 15 F.3d 1097 (1994). Furthermore, regarding damages, a statement is only legally slanderous if, *when considered alone without innuendo,* it tends to injure Plaintiff's trade or profession, *Meldeau Intern., Inc. v. Goodyear Tire & Rubber Co.,* 750 F.Supp. 1574 (S.D.Fla.1990); *Krohngold v. National Health Ins. Co.,* 825 F.Supp. 996 (M.D.Fla. 1993); *Perez v. City of Key West, Fla.,* 823 F.Supp. 934 (M.D.Fla.1993), or cause mental suffering and injury to Plaintiff's reputation. *Miami Herald Pub. Co. v. Brown,* 66 So.2d 679 (Fla.1953); *Miami Herald Pub. Co. v. Brautigam,* 127 So.2d 718 (Fla. 3d DCA 1961); *Briggs v. Brown,* 55 Fla. 417, 46 So. 325 (1908): It is undisputed that Doerr made the statements to a newspaper reporter, thereby satisfying the first and third elements of defamation. However, there remains a dispute as to whether the statements were in fact false and exactly what damages Plaintiff sustained due to the statements. Because the Court can find no damages necessarily resulting from Doerr's statements, the question of falsity becomes moot, and the Court finds in favor of Defendant on Count VI of the Second Amended Complaint.

▮ Count VI alleges slander *per se* by Doerr against Plaintiff Carlson. Under Florida law, for words to be slanderous *per se,* they must *necessarily* cause damage to the Plaintiff, in this case, either injury to his personal, reputation or business life. *Joopanenko v. Gavagan,* 67 So.2d 434 (Fla.1953); *Campbell v. Jacksonville Kennel Club,* 66 So.2d 495 (Fla.1953); *Commander v. Pedersen,* 116 Fla. 148, 156 So. 337 (Fla.1934).

Because this injury is a necessary and proximate cause of the words spoken, general damages are presumed or implied from the actual statement of the words themselves. *Belli v. Orlando Daily Newspapers, Inc.,* 389 F.2d 579 (5th Cir.1967), *cert. denied,* 393 U.S. 825, 89 S.Ct. 88, 21 L.Ed.2d 96 (1968); *McCormick v. Miami Herald Publishing Co.,* 139 So.2d 197 (Fla. 2d DCA 1962).

This is in direct contrast to slander *per quod,* in which extrinsic facts and innuendo are needed to prove the defamatory nature of the words. *Tip Top Grocery Co. v. Wellner,* 135 Fla. 518, 186 So. 219 (1938); *Piver v. Hoberman,* 220 So.2d 408 (Fla. 3d DCA 1969). With slander *per quod,* the plaintiff must specifically allege the facts and innuendo which make the words defamatory, as well as pleading special damages from such defamation. *Campbell,* 66 So.2d 495.

▮ After reviewing both Count VI and Plaintiff's brief statement of the facts in this case, the Court is not convinced that Doerr's words constitute slander *per se.*[10] Doerr's statement that Plaintiff Carlson was moved from anchor position to medical reporter because "that's his strength" does not *on its face* serve to injure Carlson's reputation or subject him to ridicule or humiliation from the public. In fact, the Court views this statement as bolstering Plaintiff's image in the medical reporting field, a field which has since expanded and become considerably significant in recent years. Regardless of the implication of the statement, Plaintiff cannot show its slanderous effect without pointing to the facts that Carlson was the morning and mid-day anchor at WPLG and had so served satisfactorily for many years—as evidenced by the absence of any negative performance reviews. Thus, the Court does not view Doerr's statement regarding Carlson's "strength" as actionable slander *per se.*

---

10. Because the Court does not consider Doerr's statements to be slander *per se,* it does not reach the issued raised by Defendant regarding opinion and/or fair comment as a defense to slander. However, the Court does note that, in *Milkovich v. Lorain Journal Co.,* 497 U.S. 1, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990), the U.S. Supreme Court held that both the First Amendment and *Gertz v.*

*Robert Welch, Inc.,* 418 U.S. 323, 337–41, 94 S.Ct. 2997, 3006–07, 41 L.Ed.2d 789 (1974), do not require a separate opinion privilege limiting application of state defamation laws. This appears to have overruled the pure opinion exception alluded to by Defendant in *Keller v. Miami Herald Pub. Co.,* 778 F.2d 711 (11th Cir.1985).

As to Mr. Doerr's statements regarding the value of veterans, the Court acknowledges that, *in the context and circumstances in which it was spoken,* the statement appears to slander the reputation of Plaintiff by imputing that he is no longer capable of performing his job because of his age and is thus less valuable in the news reporting field. However, the statement *by itself* does not directly address Plaintiff Carlson and therefore says nothing about his personal ability to perform as an anchorman in the news business. Therefore, the Court finds that both statements, although seemingly slanderous *per quod,* do not constitute slander *per se.*[11] Thus, the Court finds in favor of Defendant regarding Count VI of Plaintiff's Second Amended Complaint.

### Conclusion

Plaintiff has successfully established a prima facie case of age discrimination—both federal and state—against Defendant with regards to Defendant's failure to renew his contract. Defendant has failed adequately to rebut this prima facie case and thus is liable to Plaintiff under the ADEA and the FCRA. However, the Court finds that a genuine issue of material fact remains as to whether Plaintiff was constructively discharged by Defendant. Therefore, the Court finds that Defendant's Motion for Summary Judgment must be denied as to Counts I through IV of the Second Amended Complaint, and Plaintiff's Motion for Partial Summary Judgment must be granted as to Counts I and III of the Second Amended Complaint, but denied as to Counts II and IV.

Furthermore, Plaintiff has failed sufficiently to allege facts entitling him to summary judgment on the breach of contract and defamation claims, Counts V and VI, in that Plaintiff cannot prove the existence of any contract which could have been breached at that time and cannot demonstrate damages resulting from Defendant's allegedly slanderous statements. For these reasons and based on the foregoing facts and conclusions, it is

ORDERED AND ADJUDGED that Defendant's Motion for Summary Judgment be DENIED as to Counts I through IV of the Second Amended Complaint, Defendant's Motion for Summary Judgment be GRANTED as to liability under Counts V and VI, and Plaintiff's Motion for Partial Summary Judgment be GRANTED as to liability under Counts I and III and DENIED as to liability under Counts II and IV of the Second Amended Complaint.

It is further ORDERED AND ADJUDGED that the form and extent of damages and other relief under Counts I and III shall be determined at trial.

### *ORDER ON MOTION TO ALTER OR AMEND JUDGMENT, OR, IN THE ALTERNATIVE. FOR CERTIFICATION FOR PERMISSIVE INTERLOCUTORY APPEAL*

THIS CAUSE is before the Court upon Defendant's Rule 59(e) Motion to Alter or Amend Judgment, or in the Alternative, for Certification for Permissive Interlocutory Appeal filed May 16, 1996.

In his Second Amended Complaint, Plaintiff Arthur Carlson ("Carlson") claims Defendant WPLG/TV–10 ("WPLG") violated the Age Discrimination In Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621, as amended, and the Florida Civil Rights Act of 1992, Florida Statutes § 760.01, *et seq.,* as amended, when it terminated him from his anchor position due to his age. Defendant moved for summary judgment on all of Plaintiff's claims against it on the grounds that it permissibly relied on non-age-related objective criteria in making the decision to remove Carlson from his position as anchor and that Plaintiff quit and was not constructively discharged. Plaintiff opposed Defendant's motion in its entirety and cross-moved for summary judgment on Counts I through IV, claiming that he had presented sufficient direct and circumstantial evidence to establish that he was demoted and then constructively

---

**11.** The Court points out that, even if it chose to view Count VI as alleging slander *per quod,* Plaintiff has not met the standard for alleging special damages, as opposed to general compen-

satory damages. *Jones & Brother v. Greeley,* 25 Fla. 629, 6 So. 448 (1889). Therefore, the Court has no choice but to rule in favor of Defendant on this count.

discharged due to unlawful age discrimination.

The Court ruled in favor of Defendant on Counts V and VI and in favor of Plaintiff on Counts I through IV in its Corrected Order on Motions for Summary Judgment dated April 23, 1996. Defendant thereafter filed this motion to alter or amend based on the Court's alleged failure to apply the appropriate legal standards to the facts in this case and to set forth specifically the types of damages to which Plaintiff might be entitled. Defendant also requested certification of a permissive interlocutory appeal on these matters in the event that the Court does not grant its motion to alter or amend in its entirety.

THE COURT has considered the Motion, responses, and the pertinent portions of the record, and being otherwise fully advised in the premises, it is hereby

ORDERED AND ADJUDGED that Defendant's Rule 59(e) Motion to Alter or Amend is granted in part and denied in part, and Defendant's Alternative Motion for Certification for Permissive Interlocutory Appeal is denied for the reasons set forth below.

### *LEGAL ANALYSIS*

Defendant argues that the Corrected Order should be either vacated amended due to the Court's allegedly failing to make inferences in favor of Defendant as non-movant, usurping of the jury's factfinding function by making its own credibility assessments of deposition testimony, and failing specifically to enumerate the types of damages to which Plaintiff may be entitled in this case. The Court disagrees with Defendant's first two arguments, noting that its ruling in favor of Plaintiff Carlson on Counts I and III of the Second Amended Complaint was based not on improper credibility assessments by the Court, but on the lack of record support from which the Court could justifiably draw inferences in Defendant's favor. However, the Court agrees with Defendant that a more clear explanation of the types of damages to which Plaintiff may be entitled to, and under what circumstances Plaintiff would be entitled to them, is in order.

### Defendant's Articulated Legitimate Nondiscriminatory Reasons

In its Corrected Order, the Court stated that it was not convinced that Defendant's summary judgment papers by themselves offered a clear and specific reason to rebut Plaintiff's prima facie case, as both *Texas Dept. of Com. Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) and *IMPACT v. Firestone*, 893 F.2d 1189 (11th Cir.1990) require. *See* Defendant's Statement of Undisputed Facts, ¶ 36, at 5; Section I.A of Defendant's Summary Judgment Motion, which states that "[b]ased on management's evaluation and the research of outside consultants, management determined Carlson should focus on his medical reporting," and Section I.C, which discusses the doctrine of after-acquired evidence and Plaintiff's "emergency leave" explanation. Nevertheless, as Federal Rule of Civil Procedure 56(c) states that the Court may consider all the pleadings and depositions when considering a summary judgment motion, the Court resolved its doubts in favor of Defendant and continued with its consideration of Defendant's rebuttal evidence. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970).

So far as the Court could establish from Defendant's deposition testimony and summary judgment papers, Defendant had three separate reasons to proffer as its legitimate, nondiscriminatory reasons for terminating Plaintiff: outside consultant research (the McNulty reports),[1] Defendant's management evaluation, and after-acquired evidence of wrongdoing by Carlson.

#### A. *Outside Consultant Research*

The Corrected Order found that the McNulty reports were focus group surveys commissioned by WPLG regarding the "image" and "dynamics" of the news anchors and reporters at WPLG as seen by its viewers. The reports were commissioned be-

---

1. *See e.g.*, Exhibit no. 13, McNulty Research, Inc., a Focus Group Perspective, February 1991; Exhibit no. 14, McNulty Research, Inc., a Focus Group Perspective, June 1992; Exhibit no. 15, McNulty Research, Inc., a Focus Group Perspective, April 1993.

cause the station wanted outside feedback regarding its standing with the public in order to maintain its past level of performance. Garwood deposition, at 82 ("The research shows us how we, as an overall news franchise, are perceived in the minds of viewers and how we address those critical issues."). Defendant asserted in its motion for summary judgment, and continues to assert in the instant motion, that the results it received from McNulty's research constitute a legitimate, nondiscriminatory reason for its termination of Plaintiff. Defendant's Memorandum of Law in Support of Motion for Summary Judgment, at 6. On motion for summary judgment, the Court's role was to determine whether, taking WPLG's reliance on the McNulty reports as true, a reasonable factfinder could find that unlawful discrimination was not the cause of Plaintiff's termination. *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 506, 113 S.Ct. 2742, 2747, 125 L.Ed.2d 407 (1993).

The Court stresses that it had no difficulty finding that WPLG relied upon the McNulty reports in making its decision to terminate Carlson. Indeed, as Defendant points out, the Court must accept this reliance as true under *St. Mary's.* What the Court had difficulty with was finding that the McNulty reports constitute a *nondiscriminatory* basis for Defendant's employment actions. Although the Court agrees with Defendant that the terms "image" and "dynamics" do not refer solely to age considerations, the Court's review of the reports in consideration of the motions for summary judgment revealed that several of the questions presented to the focus groups by McNulty in order to complete the surveys were undeniably related to the age of WPLG's employees. These questions included the following:

- "Someone said it's much nicer to watch young, good-looking people on television. Isn't that true down here?" [2]
- "Does the age of the anchor make any difference in people's minds?" [3]
- "So, do you think of Channel 10 as an older group of people than any other channel, or do you see it in terms other than simply older?" [4]
- "Would you call the [Dwight Lauderdale/Diane Magnum/Don Noe/Steve Alvarez] team old?" [5]
- "Is the [Lauderdale/Magnum/Alvarez/Todd Tongen] team young, too young, or what?" [6]

Other reports in the series of surveys done for WPLG by McNulty contained comments, whether by viewers or researchers, such as, "They want newscasters from *their* generation on the argument that they can relate to them more easily (*'It's not like your mother talking at you.'*)"[7] "Getting old and gaining weight; they'll be there 'till they die;"[8] and "[N]ot in touch with the younger generation"[9] Furthermore, McNulty emphasized that WPLG's competitors had been making strides against the station in viewership by concentrating on the "young and beautiful" image.[10]

In light of the clear import of these and other questions and comments set forth in the McNulty reports, the Court found that it could not justifiably infer—*even* viewing the reports in the light most favorable to Defendant—that McNulty did not consider age when conducting his focus groups. Even if Defendant did not specifically tell McNulty to consider age and age was not the sole consideration in the reports—which the Court acknowledges it was not—but instead only a significant consideration, reliance on the McNulty reports still constitutes reliance

2. McNulty Research, Inc., A Focus Group Perspective, February, 1991 (Exhibit 13) at 16.

3. *Id.,* at 30.

4. McNulty Research, Inc., A Focus Group Perspective, June, 1992 (Exhibit 14), at 23.

5. *Id.* at 22.

6. *Id.*

7. McNulty Research, Inc., A Focus Group Perspective, April, 1993 (Exhibit 15), at 2 (emphasis in original).

8. *Id.,* at 6.

9. *Id.*

10. *Id.,* at 4.

in some measure on the impermissible factor of age. This remains true despite the fact that Defendant did not itself ask the questions or make the comments contained in the reports.[11]

The Court recognized and continues to acknowledge that Defendant's reliance on the McNulty reports is a legitimate reason for its employment actions in the sense that the Court believes that Defendant did actually rely on the reports. However, that reason was not a nondiscriminatory reason, as required by the *McDonnell Douglas* test, because it took into account the age factor. In other words, Defendant's motives were "mixed"—both legitimate and impermissible.

> An employer may not ... prevail in a mixed-motives case by offering a legitimate and sufficient reason for its decision *if that reason did not motivate it at the time of the decision* ... [A]n employer may not meet its burden in such a case by merely showing that at the time of the decision it was motivated only in part by a legitimate reason ... *The employer instead must show that its legitimate reason, standing alone, would have induced it to make the same decision.*

*Price Waterhouse v. Hopkins,* 490 U.S. 228, 252, 109 S.Ct. 1775, 1791–92, 104 L.Ed.2d 268 (1989) (emphasis added). Since the Court found that the McNulty reports were in part based on the impermissible motive of age consideration, the Court then placed on Defendant WPLG the burden to produce a legitimate reason for its actions had the McNulty reports never been commissioned in order to rebut successfully Plaintiff's prima facie case.

### B. *Management's subjective evaluation*

Setting aside the McNulty reports, Defendant's proffered legitimate, nondiscriminatory reason for terminating Carlson focused on WPLG management's subjective determination that Carlson was ineffective as an anchor and would benefit the station more by becoming a full-time featured reporter in the

growing competitive field of medical reporting. Oscar Welch deposition, at 57–59 (Carlson was not an anchor for the future because he was a non-entity as far as the public was concerned); Doerr deposition, at 56, 61, 67 (Carlson should be reassigned as a medical reporter because that was his strength). In most cases, the Court could readily have found that evidence of this management evaluation constituted a legitimate reason on which Defendant actually relied, thereby shifting the burden of production back to Plaintiff to prove showing the reason was pretextual. However, in this case, the legitimacy determination was complicated by the fact that the deposition testimony of Defendant's employees concerning the reason why Carlson was demoted failed to support the arguments made by Defendant in the motion for summary judgment.

Defendant's employees—particularly Doerr, the news director—underscored in their depositions the point that Defendant did not act on its management's subjective evaluation of Plaintiff's worth as an anchor because it did not want to act solely on its own conclusions. For example, Doerr answered as follows regarding the purpose of the McNulty reports:

> We had a lot of questions we wanted answers to. We had our own professional assessment of what we though the answers were, *but we wanted to commission somebody independent to see if there was a match between what our feelings were and what the perception and feelings of the viewers were.*

Doerr deposition, at 39 (emphasis added). Doerr emphasized that, although management had made an evaluation, it did not want to and would not act on its evaluation before having done the research to confirm it:

> [W]hat we decided to do ... was that we had a feeling that the best role for Art ... would be as a featured segment in one of the early evening newscasts, *we wanted to go outside the building and test and see*

---

**11.** The Court recognizes that Defendant asserts it claimed reliance only on the 1993 McNulty report, a report which it claims did not take age into consideration. Yet the last four questions, as well as all of the specific and general comments, cited in the previous paragraph, were taken from the 1993 McNulty report. In light of this fact, the Court must reject Defendant's argument that it did not rely in any measure on impermissible age considerations.

*whether viewers would feel that way and how they would feel about it.*

Doerr deposition, at 58–59 (emphasis added).

Q: You had already decided on March 30 to replace Peggy [Lewis] and Art, hadn't you?

A: Well, we were going into commissioning some research; and on March 30, what we felt in our gut was that was the appropriate thing to do. *However, the important caveat to virtually everything on this page* [the 3/30/93 memo] *was to do that research.*

Doerr deposition, at 70 (emphasis added).

Q: But on March 30, 1993, ... you had already decided to replace Art and Peggy at the 6:00 a.m. news.

A: *I think the phrase 'replace Peggy and Art' is misleading on this because we were going to go and commission some research from this.*

Q: But there is no reference to commissioning research on that point on the documents, is there?

A: *There is no reference to it, but that doesn't matter because we knew what we were going to do,* and we did it.

Doerr, at 87–88 (emphasis added). Doerr's recall of the discussion during a March 30, 1993 executive meeting at the Grand Bay Hotel further substantiated the conclusion that Defendant did not rely on its own subjective evaluation when making the decision regarding Carlson, but instead made the evaluation primarily in order to set the parameters for the research:

Q: So in essence, this March 30th meeting was helping you frame what you wanted McNulty to do?

A: It was a combination of what we felt were the answers, but helping formulate the questions that maybe we needed to ask.

Doerr deposition, at 43. Furthermore, to demonstrate that Carlson was treated the same as other WPLG employees, Doerr stressed that he did not make a written performance evaluation of Carlson, as standard WPLG policy dictated:

Q: Why didn't you prepare an employee performance review and planning work sheet on Art Carlson?

A: Art was treated no differently than anybody else....

Q: You never did a written performance assessment of him, did you?

A: As I did no written performance assessment of any of the other 76 people in that department.

Doerr deposition, at 55. Given the unmistakable meaning of the above statements, the Court could not justifiably infer that Defendant acted in reliance on a subjective management evaluation of Carlson when deciding to terminate him, *even* viewing Defendant's statements in the light most favorable to Defendant. Therefore, in its Corrected Order, the Court found Defendant's proffered reason that it relied subjective management evaluation to be internally inconsistent and consequently insufficient to rebut Plaintiff's prima facie case of age discrimination.

## C. After-acquired Evidence of Wrongdoing

The Court was then left with the conclusion that Defendant's legitimate nondiscriminatory reason for discharging Plaintiff is that it would have discharged Plaintiff anyway once it acquired evidence that he lied about his "emergency leave." As the Court noted in its Corrected Order, *McKennon v. Nashville Banner Publishing Co.,* 513 U.S. 352, 115 S.Ct. 879, 130 L.Ed.2d 852 (1995), cited by Defendant, is exactly on point on this issue. Under the *McKennon* standard, the Court concluded that Defendant clearly could not have relied upon evidence that Carlson lied in terminating Carlson when Defendant admitted that it did not acquire this information until depositions were taken in this case. Defendant's Memorandum of Law in Support of Motion for Summary Judgment, at 8. The Court held that, at most, the after-acquired evidence of wrongdoing would serve only to limit the amount and type of damages which may be awarded to Plaintiff.[12] Therefore,

---

**12.** For discussion of the types of damages to which Plaintiff may be entitled, see sections "Damages under the ADEA" and "Damages under the FCRA", *infra.*

the Court found that Defendant failed to carry its burden of producing a legitimate *and* nondiscriminatory reason for its decision to remove Plaintiff from his position as anchorman. Accordingly, the Court did not consider whether Plaintiff could prove that Defendant's reasons given were pretextual. Nothing in Defendant's motion has persuaded the Court that its finding in its Corrected Order were insupportable or in error. Therefore, the Court denies Defendant's motion to alter or amend its previous analysis with respect to Defendant's legitimate nondiscriminatory reason and its failure to meet its rebuttal burden.

## Adverse Employment Action

The Court found in its Corrected Order that there was no genuine dispute that moving Carlson from morning and mid-day anchorman to medical reporter constituted an adverse employment action. Although in the instant motion, Defendant disagrees that the reassignment was a demotion, or even an adverse employment action, the Court previously rejected the Defendant's position as insupportable given the statements of Defendant's employees. Doerr would not categorize the position change as a promotion for Carlson and stated that paying Carlson his anchor's salary was problematic because, as a medical reporter, he would not have the same duties. Doerr deposition, at 81–82.[13] Garwood indicated that an anchor position was more important in terms of responsibility and duties because the anchors are the "front-line" of the station and that is why they receive higher pay than reporters, even specialty reporters. Garwood did state that he personally did not think the move was a demotion, but when asked why, he answered vaguely that "many people" don't want to be anchors because of the frequent requests for public appearances. Garwood deposition, at 147–49.

The only conclusion that could have been drawn from these comments was that Defendant knew the move was tantamount to a demotion, but simply did not wish to categorize it as such. Defendant's motion does nothing to change that conclusion. Therefore, the Court remains convinced that Plaintiff has satisfied the second prong of the *McDonnell Douglas* test. As to amendment of the Court's analysis of Plaintiff's satisfaction of the *McDonnell Douglas* test, and specifically as to the finding that Defendant made an adverse employment regarding Plaintiff, Defendant's Motion to Alter or Amend is denied.[14]

## *Damages under the ADEA*

In its motion for partial summary judgment and its previous motion to alter or amend the original Order in this case, Plaintiff asserted the right to compensatory damages for mental pain and suffering, liquidated damages, backpay, frontpay, and reinstatement under the ADEA. Defendant has repeatedly insisted that Plaintiff is not entitled to frontpay or reinstatement because, under *McKennon,* the Supreme Court held that those forms of damages are not available in cases where after-acquired evidence of wrongdoing is found. Furthermore, Defendant has argued that liquidated damages are also unavailable to Plaintiff because no showing that Defendant wilfully violated the ADEA was made.

Pursuant to 29 U.S.C. § 626, the Court found that, if Plaintiff adequately demonstrates that Defendant violated the ADEA, he may be awarded reinstatement, frontpay,

---

**13.** Q: So the big picture was that Art [Crlson] could make a greater contribution to the station by being a medical reporter as opposed to an anchor?

A: As being a featured medical reporter.

Q: And that was a more superior position for him?

A: In our view, that was the best utilization of Art's skills.

Q: But you wanted to pay him less for that?

A: There [was] a problem with paying him at what he was making.... [It] would have created a lot of problems.

Q: How?

A: Well, it would have put him disproportionately ahead of the other three [featured reporters] to begin with, and that's probably the biggest hurdles to get over.
Doerr deposition, at 81–82.

**14.** The Court also concluded from the undisputed evidence that Carlson was terminated. Doerr deposition, at 112–113. The Court cannot say, however, whether the termination was due to unlawful age discrimination because the record contains disputed fact issues.

liquidated damages, backpay, and/or other forms of compensatory damages. The Court agreed with Defendant that, if Defendant could prove to a jury that Carlson's lying to the station about the purpose of his emergency leave would have resulted in immediate termination, then reinstatement and frontpay are no longer available to Carlson in light of *McKennon.* However, the Court wishes to make clear that, although it did find that Carlson lied to WPLG regarding his leave, the Court has not found and cannot properly find that Carlson's lying violated WPLG policy, as that remains a disputed factual question for the jury in this case. Defendant failed to point to a specific policy which Carlson violated, and Plaintiff insists that he did not violate any policies of the station. Based on these arguments, it is possible that a jury might find that Carlson's lying about the purpose of his emergency leave did not violate any WPLG policy and therefore *McKennon* would be inapplicable. Accordingly, the Court cannot conclusively hold that Carlson is or is not entitled to frontpay and/or reinstatement. The issue must be addressed during trial.

■ The Court agrees with WPLG that Carlson would not be entitled to liquidated damages if he had not pled and does not sufficiently demonstrate that WPLG wilfully violated the ADEA. 29 U.S.C. § 626(a). Liquidated damages apply only where a wilful violation has been properly alleged and proven, as they basically act as punitive damages in discrimination cases. *See Trans World Airlines, Inc. v. Thurston,* 469 U.S. 111, 105 S.Ct. 613, 83 L.Ed.2d 523 (1985); *Baker v. Delta Air Lines, Inc.,* 6 F.3d 632 (9th Cir. 1993); *Kelly v. American Standard, Inc.,* 640 F.2d 974 (9th Cir.1981). Nevertheless, the Court disagrees with WPLG that Plaintiff failed specifically to plead WPLG's willful violation of the ADEA. Second Amended Complaint, ¶ 17, at 5 ("The acts of WPLG/TV 10, as more particularly alleged above, constituted violations of the [ADEA] *and were done with knowing or reckless disregard of the ADEA's proscriptions.*") (emphasis added). Accordingly, the Court believes that a jury could find that WPLG willfully violated the ADEA based on the facts of this case.

Should a jury make such a finding, Carlson may be entitled to liquidated damages as a result of his termination by WPLG.

■ As to compensatory damages, the Court notes that, in an ADEA case, no damages for pain, suffering, and/or mental distress may be awarded as part of the compensatory damages award. *Dean v. American Sec. Ins. Co.,* 559 F.2d 1036, *rehearing denied* 564 F.2d 97 (5th Cir.1977), *cert. denied,* 434 U.S. 1066, 98 S.Ct. 1243, 55 L.Ed.2d 767 (1978); *Pfeiffer v. Essex Wire Corp.,* 682 F.2d 684 (7th Cir.), *cert. denied,* 459 U.S. 1039, 103 S.Ct. 453, 74 L.Ed.2d 606 (1982); *Naton v. Bank of California,* 649 F.2d 691 (9th Cir.1981). Furthermore, Plaintiff may only be awarded damages equaling the amount of insurance benefits lost due to the adverse employment action if he provides the Court with some form of evidence that he in fact purchased insurance for himself after his termination and the amount of that insurance. *Wilson v. S & L Acquisition Co., LP,* 940 F.2d 1429 (11th Cir.1991) (uncontroverted evidence of insurance purchase by plaintiff); *Brunnemann v. Terra Intern., Inc.,* 975 F.2d 175 (5th Cir.1992) (damages awarded for lost benefits limited to costs actually incurred by plaintiff). Carlson submitted neither. Therefore, the Court holds that, with respect to compensatory damages, Plaintiff is entitled only to backpay at this time. Should a jury find that Plaintiff was terminated or constructively discharged in violation of the anti-discrimination laws, or that Plaintiff's lying regarding the purpose of his emergency leave did not violate WPLG policy, then Plaintiff may be entitled to frontpay and reinstatement. Thus, regarding amendment of the Court's analysis of damages to which Plaintiff is entitled under the ADEA, the Court grants Defendant's Motion to Alter or Amend.

### Damages under the FCRA

■ Contrary to the forms of compensatory damages available to Plaintiff under the ADEA, the FCRA permits an award of damages for mental anguish, loss of dignity, and

other intangible items [15] F.S. § 760.11(5). Subject to the limits enumerated by F.S. § 768.28(5), the form and amount of such damages remains an issue for the jury to decide. Therefore, the Court holds that Plaintiff may be entitled to compensatory damages, including those for emotional injuries, under the FCRA, should a jury find that Carlson in fact suffered such emotional injuries. To the extent that Defendant's motion requests the amendment of the Court's analysis of damages under the FCRA, the Court grants Defendant's motion.

### Permissive Interlocutory Appeal

The Court agrees with Defendant that the questions presented in its motion are indeed "controlling," in terms of an incorrect disposition requiring reversal of a final judgment. 16 Charles A. Wright *et al.,* *Federal Practice & Procedure* § 3930, at 159 (1977 & Supp. 1995). Nevertheless, in light of the above analysis and the analysis presented in the Corrected Order, the Court cannot concur with Defendant's assessment that substantial grounds for disagreement are presented by the facts and record of this case. Neither does the Court believe that interlocutory appeal at this time would serve to terminate this case more quickly or in any way serve the ideals of judicial economy. Therefore, the Court denies Defendant's Motion for Certification for Permissive Interlocutory Appeal.

### Conclusion

The Court finds that, although WPLG proffered three allegedly legitimate, nondiscriminatory reasons for its action, the first two of these reasons are not both legitimate and nondiscriminatory, and the third is legally insufficient to satisfy WPLG's burden on rebuttal. Therefore, WPLG is liable to Carlson under the ADEA for backpay. However, since Carlson suffered no diminution in pay prior to his termination, the amount of backpay to which Carlson is entitled may be zero. Carlson may also be entitled to frontpay and reinstatement unless the jury finds that Carlson's lying to WPLG regarding his emergency leave violated WPLG's policy and would

have resulted in immediate termination, in which case the *McKennon* standard precludes any award of frontpay or reinstatement to Carlson. Further, Carlson may also be entitled to liquidated damages if the jury finds that WPLG willfully violated the ADEA. Finally, under the FCRA, the jury will have to decide whether Carlson is entitled to compensatory damages for emotional and mental suffering, and, if so, in what amount.

As to Defendant's request for certification under 28 U.S.C. § 1292(b), the Court does not believe that a controlling question of law that presents substantial ground for disagreement exists here or the possibility of ultimate termination of the case upon immediate interlocutory appeal. For these reasons and based on the foregoing facts and conclusions, it is

ORDERED AND ADJUDGED that Defendant's Rule 59(e) Motion to Alter or Amend is hereby GRANTED IN PART AND DENIED IN PART as set forth above, and Defendant's Alternative Motion for Certification for Permissive Interlocutory Appeal is hereby DENIED.

---

**15.** The parties' arguments regarding damages are set forth, *infra,* under the section "Damages under the ADEA." The Court need not repeat them here.